712 A.2d 1233 (1998)
313 N.J. Super. 363
STATE of New Jersey, Plaintiff-Respondent,
v.
Jose GUZMAN, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted February 17, 1998.
Decided June 29, 1998.
*1235 Ivelisse Torres, Public Defender, for defendant-appellant (Marcia Blum, Assistant Deputy Public defender, of counsel and on the brief).
Peter Verniero, Attorney General, for plaintiff-respondent (Deborah Bartolomey, Deputy Attorney General, of counsel and on the brief).
Before Judges PETRELLA, SKILLMAN and STEINBERG.
*1234 The opinion of the court was delivered by SKILLMAN, J.A.D.
This appeal from the denial of a petition for post conviction relief presents a claim by a non-English speaking criminal defendant that his constitutional rights were denied by the trial court's refusal to appoint a qualified interpreter to assist him in understanding the trial proceedings. Defendant also claims that he was deprived of the right of confrontation by the court's admission of a codefendants' out-of-court statements which indirectly implicated him in the commission of the crime.
On July 12, 1989 defendant was indicted together with codefendants Daniel and Paul DiBiase for conspiracy, contrary to N.J.S.A. 2C:5-2; receiving stolen property, contrary to N.J.S.A. 2C:20-7a; burglary, contrary to N.J.S.A. 2C:18-2; theft of movable property, contrary to N.J.S.A. 2C:20-3a; robbery, contrary to N.J.S.A. 2C:15-1; unlawful possession of a handgun, contrary to N.J.S.A. 2C:39-5b; possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-4a; aggravated assault, contrary to N.J.S.A. 2C:12-1b(4); armed burglary, contrary to N.J.S.A. 2C:18-2; armed robbery, contrary to N.J.S.A. 2C:15-1; kidnapping, contrary to N.J.S.A. 2C:13-1b; terroristic threat, contrary to N.J.S.A. 2C:12-3a; and hindering apprehension, contrary to N.J.S.A. 2C:29-3a(7) and N.J.S.A. 2C:29-3b(4). Defendant was tried jointly with Paul DiBiase before a jury in an eight day trial which ended on October 18, 1990. During the trial the court dismissed the charge of hindering apprehension. The jury found defendant guilty of all the remaining charges, except that it acquitted him of kidnapping and found him guilty of the lesser included offense of false imprisonment.
The court sentenced defendant to an extended term of fifty years imprisonment, with twenty years of parole ineligibility, for armed robbery. The court also imposed concurrent five year terms, with two-and-a-half years of parole ineligibility, for receiving stolen property, burglary and possession of a *1236 handgun without a permit, and a concurrent eighteen month term for false imprisonment.
Codefendant Paul DiBiase was found guilty of the same charges and received the same sentence.
Both defendant and DiBiase filed appeals. We granted defendants' motion to consolidate their appeals and, as is discussed later in this opinion, a single joint brief was filed on behalf of both defendants. On November 19, 1992, we affirmed defendants' convictions in an unreported opinion. State v. Guzman, A-2364-90T1, A-2484-90T1. The Supreme Court subsequently denied defendants' petition for certification. 133 N.J. 436, 627 A.2d 1141 (1993).
On July 22, 1993, defendant filed a petition for post conviction relief. Thereafter, the Public Defender assigned to represent defendant filed an amended petition and a supporting legal memorandum on his behalf. The primary arguments of the amended petition were that defendant had been deprived of the effective assistance of trial counsel and the right of confrontation because the trial court refused to assign a qualified interpreter to assist him during the trial; that he was denied the right of confrontation because the court admitted into evidence post arrest statements by codefendant Paul DiBiase which implicitly inculpated him; that his trial counsel had been ineffective in failing to move for a severance after the court ruled that Paul DiBiase's statements were admissible; that his extended term sentence was manifestly excessive; and that his appellate counsel had been ineffective because he simply joined in arguments written by counsel for DiBiase without participating in the preparation of the argument section of the appellate brief and as a result the joint brief failed to raise several meritorious points which were applicable solely to defendant.
The court conducted an evidentiary hearing on the petition at which testimony was taken from defendant and the private counsel who represented him at trial and on appeal. The court denied defendant's petition by an oral opinion.
Before addressing the arguments defendant presents in this appeal, it is appropriate to describe briefly the evidence the State presented at trial.
On the evening of May 18, 1989, defendant and Paul DiBiase left Paul's brother Daniel behind in a station wagon parked near a boat ramp in Rumson and embarked on a rubber raft for the home of Lennart and Gloria Nilson located along the Navesink River. Defendant and DiBiase landed the raft in the rear of the Nilson property and entered the home wearing masks and carrying guns.
Mr. Nilson was working late at his desk when he saw the two men walk into the room. He described the first intruder as a white male, approximately forty-five years old, five feet, ten inches tall, stocky build, having a deep resonant voice, wearing a full mask and gloves, and carrying an automatic weapon. He described the second intruder as thinner, approximately five feet, six inches tall, having a Spanish accent, wearing dark shoes, shirt and gloves, and armed with a revolver. The men ordered Mr. Nilson to lead them to the bedroom where they knew Mrs. Nilson was asleep.
The intruders told Mr. Nilson to lie face down on the bed while they took his wallet and two bank envelopes containing cash from his pockets. One of the men then awoke Mrs. Nilson as he was removing her wedding rings from her finger. Thereafter, both victims were led at gunpoint into the bathroom where they were handcuffed to the soap dish. While the Nilsons were detained in this manner, the men removed valuables and personal articles they found within the house.
After the robbers had left the residence, Mr. Nilson called the police from the bathroom telephone. The police arrived within a few minutes and dispatched a description of the two men over the air. Because footprints were found near the dock and weeds growing near the dock looked as if something had been dragged through them, the investigating detectives determined that the robbers had left the scene by water.
Around 9:30 p.m., which was approximately two hours before the robbery, Rumson police had observed a station wagon with New York license plates parked just north of the community boat ramp. At about 1:40 *1237 a.m. Rumson police officer approached Daniel DiBiase and asked him what he was doing there. Daniel responded that he was waiting for his brother and a friend, who were testing a boat on the river. He said that the three had come from Yonkers and that the other two had left for Atlantic City at approximately 9:00 p.m. in a rubber raft with a black and blue stripe and a light colored outboard engine. Daniel described his brother as being five foot ten, with the stocky build of a weightlifter, and the friend as approximately five foot six, with a thin build and speaking with an accent. The Rumson police continued to check periodically on Daniel because of their suspicion regarding the boaters' distant destination and the length of their absence. At approximately 2:40 a.m., they induced Daniel DiBiase to come to the police station and file a missing persons report. The details of the report, which included a description of Paul DiBiase and defendant, were disseminated to the Marine Police and local authorities.
Sometime between 4:30 a.m. and 5:00 a.m. a police patrol boat found a black rubber raft with a white outboard engine, similar to the one described by Daniel DiBiase, on the north shore of the Navesink River, west of the Nilson dock. The police also found a blue jacket draped over the outboard engine, an automatic BB gun pistol, a packing slip with the Nilsons' name on it, rolled coins, a crowbar, a black sneaker, a gas can, and a blue ski cap. Subsequently, human head hairs recovered from the jacket and cap were found to be microscopically consistent with defendant's hair, and the blue acrylic fiber recovered from defendant's shirt was found to be consistent with blue acrylic found on the cap. A week later, the police discovered a large quantity of the Nilsons' valuables and other personal property taken in the robbery in the woods alongside the Navesink River near where the raft had been found.
At approximately 10:00 a.m. a police officer involved in the investigation noticed two men standing at a bus stop who fit the description of the two robbers. The officer also observed that their clothes were disheveled and sandy, their pants were wet from the knees down, and their arms were scratched and scraped. In addition, the stocky man spoke to the slender one in Spanish. Although neither of the suspects, who were subsequently identified as Paul DiBiase and defendant, had any weapons or identification, each had a wad of cash and defendant had a bank envelope from Mr. Nilson's bank.
At trial, the State also presented Detective Michael Cerame's testimony regarding certain inculpatory statements of codefendant Paul DiBiase. Cerame testified that he expressed concern to DiBiase that only one of the suspects' handguns had been recovered, and that there were two schools located between the site where that gun was found and the site of the arrest. Cerame testified that in response, Paul DiBiase stated something to the affect "I didn't have to worry about the gun. It wasn't real and nobody was going to get hurt by it if he had a gun." Cerame also testified that when he told Paul DiBiase he had had a conversation with his brother, DiBiase "said something to the effect that his brother wouldn't roll over on him."
On appeal, defendant makes the following arguments:
I. THE ABSENCE OF A CERTIFIED INTERPRETER AT THE TRIAL VIOLATED DEFENDANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO BE PRESENT AT HIS TRIAL, TO CONFRONT THE WITNESSES AGAINST HIM AND TO ASSISTANCE OF COUNSEL, AND COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE ABSENCE OF AN INTERPRETER AT TRIAL AND ON APPEAL.
II. ADMISSION OF CODEFENDANT PAUL DIBIASE'S INCULPATORY STATEMENTS AT HIS AND DEFENDANT'S JOINT TRIAL VIOLATED DEFENDANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO CROSS-EXAMINE THE WITNESSES AGAINST HIM, AND COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE ISSUE AT TRIAL AND ON APPEAL.
*1238 III. THE EXTENDED GRAVES ACT TERM IS ILLEGAL, AND AN EXTENDED TERM IS EXCESSIVE. (Not Raised Below).
In response, the State argues that these claims are not cognizable on post-conviction review because they could and should have been raised in defendant's direct appeal.[1]
We conclude that defendant did not receive effective assistance of counsel in his direct appeal. Consequently, we have considered the issues presented in this appeal as if they were being presented in a direct appeal. However, we conclude that defendant was not denied a fair trial by the trial court's failure to appoint a court-certified interpreter to interpret the trial proceedings or by the admission of codefendant Paul DiBiase's inculpatory statements, and that the extended term sentence imposed upon defendant was not excessive. Therefore, we affirm the denial of defendant's petition.

I
The State argues that the arguments which defendant raises in this appeal are not cognizable on a petition for post conviction relief because they could have been raised on his direct appeal.
Rule 3:22-4 provides in pertinent part:
Any ground for relief not raised ... in the proceedings resulting in the conviction... or in any appeal taken in any such proceedings, is barred from assertion in a proceeding under this rule unless the court on motion or at the hearing finds (a) that the ground for relief not previously asserted could not reasonably have been raised in any prior proceeding; or (b) that enforcement of the bar would result in fundamental injustice; or (c) that denial of relief would be contrary to the Constitution of the United States or the State of New Jersey.
Post-conviction relief, which is New Jersey's analogue to the federal writ of habeas corpus, provides a defendant with a procedure for challenging the legality of a conviction or sentence on grounds which could not have been raised on a direct appeal. State v. McQuaid, 147 N.J. 464, 482, 688 A.2d 584 (1997). Post-conviction relief is not a substitute for a direct appeal, and a defendant who relies upon grounds which could have been raised in a prior proceeding may be barred from post-conviction relief. State v. Preciose, 129 N.J. 451, 459, 609 A.2d 1280 (1992). However, because ineffective-assistance of counsel claims "are grounded in the Sixth Amendment and the New Jersey Constitution," petitioners are "rarely barred" from raising such claims on post conviction review. Id. at 459-60, 609 A.2d 1280. See also State v. Moore, 273 N.J.Super. 118, 125, 641 A.2d 268 (App.Div.), ("[I]neffective assistance of counsel claims, particularly ineffective assistance of appellate counsel, are congruous with the exceptions to the procedural bar of R. 3:22-4."), certif. denied, 137 N.J. 311, 645 A.2d 139 (1994). Therefore, defendant's claim that he was provided with ineffective assistance of counsel in his direct appeal is properly before us on this appeal.
At the hearing on the petition for post-conviction relief defendant's former attorney admitted that he had failed to review the trial record to determine what issues should be raised on defendant's direct appeal:
Q. Now, you also represented Mr. Guzman on his direct appeal on his conviction, right?
A. Yes.
Q. You never raised the issue of the denial of a Court Certified Interpreter on appeal, did you?
A. No, I didn't. That was because ... Mr. Guzman ... called me and essentially *1239 ... begged me, would I join in on the appeal for him? I told him, well, I hadn't been paid for the trial but what I would do is consolidate with [counsel for Paul DiBiase], and basically he would handle the appeal....
Because I just felt I had done more than enough for Mr. Guzman up to that point, basically pro bono from the beginning.... And how I helped was I was forwarded the transcripts of the appeal and I sorted out all the facts and wrote up the statement of facts and [counsel for DiBiase] did all of the issues as to the law and that was his job with regard to the appeal.
Q. So, as Mr. Guzman's attorney on direct appeal, you took no part in the framing or the articulation of any legal issue to be raised on appeal, is that right? You just did the statement of facts?
A. I just did the statement of facts. It was a consolidated work between the both of us.
Q. You read through the brief, though, didn't you? Before it was submitted to the Appellate Court?
A. I don't recall.
Consequently, the only issues raised on defendant's direct appeal were ones that concerned both he and Paul DiBiase or solely DiBiase. Any issues that affected only defendant, such as the court's failure to assign him an interpreter, the introduction of DiBiase's statements which allegedly inculpated him, and the excessiveness of his sentence, were not raised.
To prevail on a claim of ineffective assistance of counsel, a defendant ordinarily must show that "counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment" and that "there is `a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" State v. Fritz, 105 N.J. 42, 52, 519 A.2d 336 (1987) (quoting Strickland v. Washington, 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 2064, 2068, 80 L. Ed.2d 674, 683, 698 (1984)). These standards apply to claims of ineffective assistance at both the trial level and on appeal. State v. Morrison, 215 N.J.Super. 540, 545-46, 522 A.2d 473 (App.Div.), certif. denied, 107 N.J. 642, 527 A.2d 463 (1987); accord Grubbs v. Singletary, 120 F.3d 1174, 1176 (11th Cir. 1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1388, 140 L. Ed.2d 647 (1998); Griffin v. United States, 109 F.3d 1217, 1219 (7th Cir. 1997). However, if a defendant can show that there has been a complete denial of the assistance of counsel, prejudice is presumed. United States v. Cronic, 466 U.S. 648, 658-59, 104 S.Ct. 2039, 2046-47, 80 L. Ed.2d 657, 667-68 (1984); Fritz, supra, 105 N.J. at 53, 519 A.2d 336. Thus, in Anders v. California, 386 U.S. 738, 744-45, 87 S.Ct. 1396, 1400, 18 L. Ed.2d 493, 497-98 (1967), the Court held that a defense attorney's failure to submit any brief in support of a direct appeal from a criminal conviction constituted a denial of the right to counsel. See also Evitts v. Lucey, 469 U.S. 387, 396-400, 105 S.Ct. 830, 836-38, 83 L. Ed.2d 821, 830-32 (1985).
We conclude that the limited role which defendant's former counsel played in the preparation of the brief submitted in support of his direct appeal was the functional equivalent of the failure of counsel in Anders to file any brief at all. Defendant's former counsel admitted that he played no role in the formulation of the issues raised in the joint brief submitted in the direct appeal and that he not only failed to participate in the preparation of the argument section of the brief but may not have even read it. Moreover, defendant's brief in this appeal clearly demonstrates that there were substantial issues unique to defendant which could and undoubtedly would have been raised if his former counsel had actively participated in the preparation of the argument section of defendant's brief. Therefore, defendant did not receive effective assistance of counsel in his direct appeal, and Rule 3:22-4 does not bar our review of the issues defendant raises. To remedy the prejudice to defendant resulting from the ineffective assistance he received in his direct appeal, we have considered the issues presented on this appeal from a denial of post conviction relief as if they were being presented in a direct appeal. Cf. Mayo v. Henderson, 13 F.3d 528, 537 (2d Cir.1994).

*1240 II
Defendant argues that the trial court's failure to provide him with a court-certified Spanish interpreter violated his federal and state constitutional rights to be present at his trial, to confront the witnesses against him and to assistance of counsel.
Although defendant had been provided with a certified interpreter in connection with pretrial motions during the period he was represented by the Public Defender, the court refused to assign him an interpreter once he retained private counsel. When defendant's attorney indicated that defendant would need an interpreter during trial, the court stated:
If a witness gets up on the stand ... and is giving testimony in English, ... the State is not ... required to pay for an Interpreter to sit next to the Defendant and tell him what that witness is saying. If a witness gets on the stand and it was in Spanish, a foreign language, any foreign language, ... then the Court must pay for an Interpreter to be here to interpret that Spanish into English. When the Defendant testifies, if he does testify, to interpret what he says to the Jury. But not for the purpose of sitting next to him for the entire course of the trial, particularly when you have private counsel. ...
He could pay for a lawyer. He has to pay for an Interpreter, too. Why do we have to provide an Interpreter for him? ... [Y]ou bring your own Interpreter.
In response to defense attorney's inquiry as to whether the interpreter had to be a "professional," the court said:
You can bring his brother, you could bring his sister, you can bring anybody that you wish to have, because you see at that point, I just want to make it so I think you can understand it. That person is not put under oath. I am not putting this Interpreter under oath to interpret truly to him because he is not interpreting anything on behalf of the Court. He is interpreting for him privately. That is fine if you want to bring his sister or his brother. You see, he might be more comfortable with his sister or his brother or someone talking to him.... I want you to understand my thinking and I want the record to reflect that the Court is not vouching for the truthfulness of that Interpreter when I can't have any control of it between the two of them.
The following morning, defendant's attorney introduced Miriam Irrazari to the court as "a friend of the family ... that's here to interpret." The court did not question Ms. Irrazari concerning her ability to interpret court proceedings or give her any instructions as to how to interpret.
Defendant testified at the hearing on his petition for post conviction relief that even though he had been in the United States for eleven years prior to the trial, he did not understand spoken English at that time. Defendant also testified that Ms. Irrazari sat next to him throughout the trial, telling him "the most important parts of the case." When asked if Irrazari was interpreting every word spoken, defendant said
There were occasions like when the Judge was speaking that she would tell me that the Judge was speaking some parts. But sometimes he was speaking and she wasn't speaking.
Defendant also testified that he had no knowledge of Paul DiBiase's inculpatory statements to Cerame.
Defendant's trial attorney testified at the hearing on the petition that he "knew [Ms.] Irrazari and ... felt as though she would have no problem doing [the interpretation] for us." He also said that he explained to her how to do the interpretation. In addition, defendant's attorney testified that Irrazari was defendant's girlfriend and defendant "was happy to have her there" during the trial. He further testified that Irrazari never indicated "she was having trouble keeping up with the proceedings" and defendant never indicated "there were gaps in the proceedings... he was not acquainted with." Moreover, he was certain that he had discussed DiBiase's incriminating statements with defendant prior to trial, because he had been trying to convince defendant to accept the State's plea offer.
The trial court concluded that defendant had not been deprived of the effective assistance *1241 of trial counsel or the right of confrontation because of the absence of a qualified interpreter or denied the effective assistance of appellate counsel because of his former attorney's failure to raise this issue on his direct appeal, because a court is not required to provide an interpreter when a defendant is represented by private counsel. In addition, the court found that Irrazari had provided defendant with an adequate interpretation of the trial proceedings:
It is argued that ... she is not a certified interpreter and therefore, we must assume that the interpretation was not thorough and not complete and not word for word. I do not believe that you can come to that conclusion. While it may be easy to say that it may not have been word for word, he got all of the information that was coming out during the course of the trial, interpreted to him through the interpreter.
I think that is all that is required for an understanding of what is transpiring during the course of the trial.
He said that she not only went so far as to tell him what was going on, she was interpreting questions by the Prosecutor, comments by the Judge, statements by the witnesses....
He was also comfortable with that person. She was a friend of his. This was not somebody who would have an adverse interest to him.... And [defense counsel] said he seemed to be happy to have her there.
In State v. Linares, 192 N.J.Super. 391, 394, 470 A.2d 39 (Law Div.1983), Judge Stern concluded, quoting In re Murga, 631 P.2d 735, 736 (Okla.1981), that "[w]hen a defendant cannot speak or understand English," the right to counsel, to be present at one's own trial and to confront and cross-examine adverse witnesses "cannot be preserved without the assistance of an interpreter." In State v. Kounelis, 258 N.J.Super. 420, 427, 609 A.2d 1310 (App.Div.), certif. denied, 133 N.J. 429, 627 A.2d 1136 (1992), we indicated our agreement with this conclusion, noting that "[i]t is a self-evident proposition that a defendant who is unable to speak and understand English has a right to have his trial proceedings translated so as to permit him to participate effectively in his own defense." See also State v. Rodriguez, 294 N.J.Super. 129, 133-37, 682 A.2d 764 (Law Div.1996). Although there is no decision of the Supreme Court of the United States or the Supreme Court of New Jersey dealing with this issue, other courts throughout the country have also held that a criminal defendant has a constitutional right to the assistance of an interpreter at trial. See, e.g., United States v. Carrion, 488 F.2d 12, 14 (1st Cir.1973), cert. denied, 416 U.S. 907, 94 S.Ct. 1613, 40 L. Ed.2d 112 (1974); United States ex rel Negron v. State of New York, 434 F.2d 386, 390-91 (2d Cir.1970); State v. Neave, 117 Wis.2d 359, 344 N.W.2d 181 (1984); see generally Thomas M. Fleming, Annotation, Right of Accused to have Evidence or Court Proceedings Interpreted, 32 A.L.R. 5th 149 (1995).
Furthermore, as with other necessary costs of a criminal defense, a defendant is entitled to have the State pay for an interpreter if he is unable to afford one. Kounelis, supra, 258 N.J.Super. at 426, 609 A.2d 1310. Consequently, if a defendant is unable to understand court proceedings without an interpreter, the court must inquire through the court interpreter whether he can afford his own interpreter, and if he cannot, the court must appoint one for him. Ibid. A court may not assume a defendant can afford his own interpreter simply because he is represented by private counsel. Cf. In re Cannady, 126 N.J. 486, 492-97, 600 A.2d 459 (1991).
The trial court failed to ask defendant whether he could afford his own interpreter or inform him that an interpreter would be appointed for him at public expense if he did not have the funds to pay for his own. Furthermore, the record developed at the hearing on the petition for post conviction relief indicates that defendant's resources were limited and that he probably could not afford his own interpreter.[2] Consequently, if defendant *1242 had been tried without receiving any form of interpretation of the proceedings, a reversal of his conviction would be required. Kounelis, supra; see also United States ex rel. Negron v. State of New York, supra, 434 F.2d at 389 (A non-English speaking defendant who was denied the services of an interpreter at trial was denied the right of confrontation and the right to be present at his own trial). However, because Irrazari provided defendant with an interpretation of the trial proceeding, the question is whether that interpretation was adequate.
"[T]he general standard for the adequate translation of trial proceedings requires continuous word for word translation of everything relating to the trial a defendant conversant in English would be privy to hear." United States v. Joshi, 896 F.2d 1303, 1309 (11th Cir.), cert. denied, 498 U.S. 986, 111 S.Ct. 523, 112 L. Ed.2d 534 (1990). However, "minor deviations from this standard will not necessarily contravene a defendant's constitutional rights." Ibid. Therefore, when a defendant seeks reversal of his conviction based upon the alleged inadequacy of the interpretation of trial proceedings, a reviewing court must decide "whether any inadequacy in the interpretation `made the trial fundamentally unfair.'" Ibid. (quoting Valladares v. United States, 871 F.2d 1564, 1566 (11th Cir.1989) (Powell, J.)); see also Liu v. State, 628 A.2d 1376, 1385 (Del.1993) (holding that defendant was not denied a fair trial when interpreter "accurately convey[ed] the substance and meaning of the witness' testimony" even though interpretation was not "word for word"); State v. Pham, 75 Wash.App. 626, 879 P.2d 321, 326 (1994)(holding that a defendant does not have "a constitutional right to a certified interpreter"), review denied, 126 Wash.2d 1002, 891 P.2d 37 (1995).
Defendant failed to demonstrate that the alleged inadequacies in the interpretation provided by Ms. Irrazari deprived him of a fair trial. Defendant conceded that Irrazari was with him throughout the trial informing him of "the most important parts of the case." Moreover, his trial attorney testified that Ms. Irrazari never indicated she was having difficulty keeping up with the proceedings and defendant never complained about the interpretation he was receiving. Most significantly, defendant does not suggest that his defense would have been different if he had received a more complete interpretation of the trial proceedings. Defendant does not suggest, for example, that he was unaware of some part of the State's case which would have led him to take the stand[3] or to present a defense witness who was not called at trial.
The only specific part of the trial testimony which defendant claims Irrazari failed to communicate to him was Cerame's testimony about DiBiase's inculpatory statements. However, his trial attorney testified that these statements were one of the components of the State's evidence he discussed with defendant in seeking to persuade him to accept the State's plea offer. Furthermore, we note that DiBiase's alleged statement to Cerame that the missing gun was not real was read in open court at a pretrial hearing held on January 12, 1990, at which a court-appointed interpreter provided defendant with an interpretation of the proceedings. In any event, defendant does not indicate that his defense of the charges would have been any different even if he had been aware of DiBiase's statements. Therefore, we conclude that defendant received a fair trial despite the court's error in failing to appoint a qualified interpreter to interpret the trial proceedings.

III
Defendant argues that Paul DiBiase's out-of-court inculpatory statements were inadmissible because they were hearsay concerning which he could not exercise his constitutional right of confrontation. Defendant also argues that his trial counsel was ineffective in failing to object to the introduction of these statements or to seek a limiting instruction. *1243 The State responds that the statements were properly admitted because they did not directly incriminate defendant but only implicated him indirectly through inferential linkages.
Defendant's argument is predicated upon two statements which Paul DiBiase allegedly made to Detective Cerame after his arrest. First, when Cerame expressed concern that the police had only found one of the two guns used in the crime and that there were two schools in the area where the suspects had been apprehended, Cerame testified that DiBiase responded by saying "something to the effect I didn't have to worry about the gun. It wasn't real and nobody was going to get hurt by it if he had a gun." Second, Cerame testified that when he advised DiBiase of a conversation he had had with his brother, DiBiase "said something to the effect that his brother wouldn't roll over on him." Defendant's trial attorney did not object to this testimony or request that the jury be given a limiting instruction.
Defendant's argument that the admission of DiBiase's statements deprived him of the right of confrontation is based upon State v. Young, 46 N.J. 152, 215 A.2d 352 (1965) and Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L. Ed.2d 476 (1968). In Young, the Supreme Court of New Jersey held that it was reversible error for a trial court to deny a defendant's motion to excise all references to him in a codefendant's confession. The Court rejected the State's argument that the prejudice to the defendant from the admission of the codefendant's statement specifically identifying him as an accomplice could be eliminated by a limiting instruction. 46 N.J. at 156-58, 215 A.2d 352. In Bruton, the Supreme Court of the United States reached the same conclusion, stating that where a codefendant's confession expressly identifies a defendant as an accomplice, the defendant's right of confrontation is violated because "we cannot accept limiting instructions as an adequate substitute for [the] constitutional right of cross-examination." 391 U.S. at 137, 88 S.Ct. at 1628, 20 L. Ed.2d at 485.
In Richardson v. Marsh, 481 U.S. 200, 107 S.Ct. 1702, 95 L. Ed.2d 176 (1987), the Court revisited the principles set forth in Bruton in a case where, as in this case, the codefendant's statement did not identify the defendant as an accomplice but other evidence in the case linked defendant to the confession. The Court characterized Bruton as recognizing a "narrow exception" to the general principle that jurors can follow limiting instructions, id. at 207, 107 S.Ct. at 1707, 95 L. Ed.2d at 185-86, and concluded that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when ... the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." Id. at 211, 107 S.Ct. at 1709, 95 L. Ed.2d at 188. The Court reasoned that:
There is an important distinction between this case and Bruton, which causes it to fall outside the narrow exception we have created. In Bruton, the codefendant's confession "expressly implicat[ed]" the defendant as his accomplice. Id. at 124, n. 1, 88 S.Ct. at 1621, n. 1. Thus, at the time that confession was introduced there was not the slightest doubt that it would prove "powerfully incriminating." Id., at 135, 88 S.Ct., at 1627. By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony).
Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence. Specific testimony that "the defendant helped me commit the crime" is more vivid than inferential incrimination, and hence more difficult to thrust out of mind....
Even more significantly, evidence requiring linkage differs from evidence incriminating on its face in the practical effects which application of the Bruton exception would produce. If limited to facially incriminating confessions, Bruton can be complied with by redaction.... If extended to confessions incriminating by connection, not only is that not possible, but it is not even possible to predict the admissibility of a confession in advance of trial....

*1244 One might say, of course, that a certain way of assuring compliance would be to try defendants separately whenever an incriminating statement of one of them is sought to be used. That is not as facile or as just a remedy as might seem. Joint trials play a vital role in the criminal justice system.... Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpabilityadvantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.
[Id. at 208-10, 107 S.Ct. at 1707-09, 95 L. Ed.2d at 186-87.]
In State v. Melendez, 129 N.J. 48, 58, 609 A.2d 1 (1992), the Supreme Court of New Jersey seemed to indicate that it would follow Richardson in interpreting the Confrontation Clause of the New Jersey Constitution (N.J. Const. art. I, para. 10), by stating with apparent approval that the Court in Richardson had "noted an `important distinction' between a codefendant's confession that expressly implicates the remaining defendant and one that incriminates that defendant only when linked with other evidence presented by the prosecution."
Paul DiBiase's statements to Detective Cerame did not directly inculpate defendant. In fact, those statements did not even indicate that there was another person in addition to his brother involved in the crime. Thus, as in Richardson, DiBiase's statements provided evidence of defendant's guilt only when linked with the State's other evidence which showed that defendant and DiBiase fit the victims' descriptions of the perpetrators and that they were seen together before and after the crime. Although the trial court failed to give the jury a limiting instruction that DiBiase's statements could not be considered in determining defendant's guilt, N.J.R.E. 105 generally imposes the obligation upon defense counsel to request a limiting instruction. See State v. Montesano, 298 N.J.Super. 597, 617-18, 689 A.2d 1373 (App.Div.), certif. denied, 150 N.J. 27, 695 A.2d 670 (1997) (holding N.J.R.E. 105 to be applicable to a limiting instruction regarding a codefendant's inculpatory statement).
We conclude that the court's admission of DiBiase's statements without a limiting instruction was not "clearly capable of producing an unjust result" and thus constituted harmless error. R. 2:10-2. The State presented overwhelming evidence of defendant's guilt independent of DiBiase's statements. The victims provided physical descriptions of the robbers' appearances and speech accents which matched those of DiBiase and defendant. Defendant's head hairs were consistent with hairs found on objects in and near the raft used in the robbery. Defendant's arms were scratched and his clothes were wet and covered with sand when he was apprehended the morning after the crime. Furthermore, defendant had a wad of money in his pocket in an envelope from Mr. Nilson's bank. This evidence, together with Daniel DiBiase's incriminating statements made prior to his arrest which were properly admitted at trial, prove beyond any reasonable doubt that Paul DiBiase's statements did not cause the jury to reach a result it otherwise would not have reached. See Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L. Ed.2d 340 (1972) (holding that erroneous admission in violation of Bruton of confession of codefendant implicating defendant in crime was harmless in view of "overwhelming" other evidence of defendant's guilt); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L. Ed.2d 284 (1969) (same).
For substantially the same reasons, we reject defendant's argument that his trial counsel provided ineffective assistance in failing to request the court to give the jury a limiting instruction regarding its consideration of DiBiase's statements. Because the other evidence of defendant's guilt was so overwhelming, we are unable to conclude that "there is `a reasonable probability that... the result of the proceeding would have been different'" if the court had given a limiting instruction upon defense counsel's request. Fritz, supra, 105 N.J. at 52, 519 A.2d 336 (quoting Strickland, supra, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L. Ed.2d at 698).

*1245 IV
Defendant's arguments relating to his sentence only require brief discussion. Defendant correctly points out that the trial court erred insofar as it relied upon the mandatory extended term sentencing provisions of the Graves Act, because "the mandatory imposition of an extended term under N.J.S.A. 2C:44-3d and N.J.S.A. 2C:43-6c cannot be based upon a foreign conviction[,]" State v. Copeman, 197 N.J.Super. 261, 265, 484 A.2d 1250 (App.Div.1984), and all of defendant's prior convictions involving the use of a firearm were imposed in New York. However, the trial court clearly stated that it was imposing an extended term sentence under both the Graves Act and the discretionary extended term sentencing provision of N.J.S.A. 2C:44-3d. In fact, the court began sentencing defendant by referring solely to its discretionary sentencing authority. It was only when the prosecutor inquired as to the basis of the extended term sentence that the court indicated defendant was being sentenced under both sentencing provisions. Consequently, the sentence imposed on defendant was not dependent upon the applicability of the Graves Act, and the court's reference to that legislation was harmless error. Defendant's three prior convictions for robberies committed in New York within ten years of this offense obviously qualified him for sentencing as a persistent offender. N.J.S.A. 2C:44-3a; N.J.S.A. 2C:44-4c; see Copeman, supra, 197 N.J.Super. at 265, 484 A.2d 1250. Moreover, the seriousness of defendant's record and the aggravated nature of this offense, involving a carefully planned, armed invasion of a private residence during which the perpetrators terrorized the victims to induce them to disclose the location of their valuables, provided a more than sufficient basis for the court to impose the presumptive extended base term of fifty years imprisonment, with twenty years of parole ineligibility. See State v. Dunbar, 108 N.J. 80, 89-95, 527 A.2d 1346 (1987).
Affirmed.
NOTES
[1] The State has filed a notice of cross appeal "from the portion of [the trial court's oral opinion] which refused to dismiss petitioner's petition for post conviction relief on procedural grounds." However, appeals are taken solely from orders or judgments, not from opinions. Heffner v. Jacobson, 100 N.J. 550, 553, 498 A.2d 766 (1985). Consequently, a party does not need to file a cross appeal in order to argue alternative grounds for an affirmance. Chimes v. Oritani Motor Hotel, Inc., 195 N.J.Super. 435, 443, 480 A.2d 218 (App.Div.1984). Since the order which is the subject of this appeal denied defendant's petition, and the State seeks affirmance of that order, there was no reason for a cross appeal. Accordingly, the State's cross appeal is dismissed.
[2] Defendant had been represented by the Office of the Public Defender until two weeks before trial. The attorney who represented defendant at trial was apparently retained with funds given by Miriam Irrazari.
[3] As discussed in section IV of this opinion, defendant had a substantial criminal record which would have been placed before the jury if he had taken the stand.