# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2593-18T2

R.T.,

     Plaintiff-Respondent,

v.

T.N.,

     Defendant-Appellant.

_____

Submitted December 17, 2019 - Decided January 10, 2020

Before Judges Accurso and Gilson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FV-09-2547-18.

Franz Cobos, attorney for appellant.

Treuhaft & Zakarin, LLP, attorneys for respondent (Miriam E. Zakarin, on the brief).

PER CURIAM

    Defendant T.N. appeals from a final restraining order entered against

him pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17

to -35, based on the predicate act of assault.  He contends the final restraining order was not supported by substantial credible evidence, in part because of errors in the interpretation of the testimony, and that the evidence failed to establish plaintiff R.T. needed the protection the order provides.  Having reviewed the record, we cannot agree and affirm the restraining order.

The parties were married in India several years ago.  They have two young children.  At the hearing on the final restraining order, plaintiff testified through a Tamil interpreter, although defendant contends his wife, who has an engineering degree and leads a team of software engineers for Deutsche Bank, speaks fluent English.

Plaintiff testified to events over one weekend in June 2018, that began with defendant upbraiding her for failing to call him at work on Friday and ended with her fleeing their apartment with the children on Sunday after he repeatedly struck her.  Plaintiff claimed she was working from home on Friday and got too busy to call defendant to check in during the morning as she usually did.  When she called him at lunchtime, she claimed he was very upset and wanted to know what had kept her from telephoning.

When defendant got home from work that evening, he asked her if she was having sex with someone else that morning.  When she tried to explain

that she had just been busy with work, he threatened to send her back to India. He also complained about the dinner she cooked him, and that she broke off rubbing his back in order to deal with the children. Plaintiff explained she was trying to keep their toddlers from breaking something, which she knew would upset him, when he started to berate her for not being able to even massage his back properly.

The next day, defendant berated her for giving their four-year-old a new pencil for him to write with while she cooked lunch. Plaintiff claimed her husband hit her and painfully twisted her hand while asking "why don't you have any sense . . . don't you have any brains? Why are you giving a new pencil to him? Why don't you search for the old pencil and give it to him?"

On Sunday morning, they got into an argument over property in India. Defendant asked about details of the purchase plaintiff could not recall. Defendant told her to call her mother for the information, which plaintiff declined to do immediately as she knew her mother was dealing with a family problem and wasn't available. Defendant responded by telling her she was to do as he said and slapped her. He then took a metal ruler from his desk and beat her with it. He also grabbed her hair and pushed her head into a wall, kicking her in the chest when she fell to the floor. Plaintiff testified she was

3

crying and told him she would call her mother right away if he wanted. She claimed defendant responded by threatening to kill her and telling her he could not live peacefully unless she was dead.

Plaintiff told the court he had threatened her with knives in the past, and had also threatened that he would have her parents killed in India. She testified she believed he would kill her. When the superintendent of their building came to speak with defendant about a leak, plaintiff took the children and fled the apartment, calling the police. The police responded and assisted plaintiff in removing some papers and clothing from the apartment. Plaintiff went with the children to a friend's house and later sought a temporary restraining order. She testified she was afraid to stay in the apartment even after she obtained the temporary order. She explained she felt safer living elsewhere with the children and asked that her address remain confidential and not be disclosed to defendant.

Defendant denied ever threatening or striking his wife. He claimed they had a "two minute argument" when plaintiff "was giving the kid a new pencil and [he] said, you know, why not tell [the four-year-old] how to, you know, like put the old pencil down, put the pencil in a particular place and, then, (indiscernible) why not teach him that, that's what it is." He testified his wife

4

disappeared with the children when the superintendent was in the apartment, and when he went downstairs to look for them, he found his wife "talking to the police." Asked by his counsel to describe his wife's demeanor, defendant testified

> [s]he was fine. She was — she was normal . . . and, then, when I went outside she was trying to say — like she was trying to say no, I don't want to go in, I don't want to live [there anymore]. I mean she was showing some tantrums there. That's how it was. But, otherwise, she was physically fine, no issues with that.

Defendant claimed the couple had "arguments like every other family do[es]. But it was nothing physical or nothing threatening or nothing to the fact that it was — it would scare her." Asked whether they had discussed divorce, defendant testified, "[n]ot exactly about divorce. But we're thinking what should we do to not get in — not get into the divorce part of it." Asked for his opinion as to why his wife was seeking a restraining order, defendant said he thought "she's trying to get an upper hand in the divorce which is what she's planned for. She's trying to make all the things that I have money, my other thing and she wants to get my kids. That's what she's trying to do."

The police officers who responded to the family's home, accepted plaintiff's complaint and took pictures of her alleged injuries also testified. The officers testified plaintiff was very emotional. One of them testified that

5

plaintiff did not tell them "that she was scared of [defendant]. She just didn't want to be near him. She appeared afraid of him." Another of the officers testified he asked plaintiff what happened. Although she attempted to tell him and made "a motion of being struck at the back of her head," he testified there "was a very strong language barrier, so I couldn't really understand her."

Having listened to the testimony, the judge found plaintiff's "testimony to be more believable than [defendant's], largely based on their demeanor, and the fact that there had been discussions prior to these incidents about the future of their relationship." He accepted plaintiff's account of defendant haranguing her about not calling him at the office on Friday and found defendant painfully twisted her hand the following day after berating her for giving their older son a new pencil.

The judge also believed defendant slapped plaintiff, pulled her hair, hit her with a metal ruler and pushed her against the wall after the two argued about the property in India on Sunday. He found defendant hit plaintiff and threatened to kill her after she fell to the floor. Although concluding plaintiff's "testimony as to the supposed earlier incidents was not terribly detailed or helpful," the judge found that "given the two incidents of physical violence on June 16th and June 17th a restraining order [was] necessary to protect her

6

against further domestic violence without consideration of any prior domestic violence."

Defendant appeals, contending the evidence did not support entry of a final restraining order, in part because of the faulty interpretation of plaintiff's testimony by the Tamil interpreter and plaintiff's failure to establish the order was necessary to protect her against future acts of domestic violence. We disagree.

Our review of a trial court's factual findings is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). Findings by the trial court "are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 412 (citing Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484 (1974)). Deference is especially appropriate in a case, such as this one, in which the evidence is largely testimonial and involves questions of credibility because the trial court's ability to see and hear the witnesses provides it a better perspective than a reviewing court to judge their veracity. Ibid.

A final restraining order may issue only if the judge finds the parties have a relationship bringing the complained of conduct within the Act, N.J.S.A. 2C:25-19(d); the defendant committed an act designated as domestic violence, N.J.S.A. 2C:25-19(a); and the "restraining order is necessary, upon

an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006).

Applying those standards here, we find no basis to upset the factual findings or legal conclusions of the trial court set forth above. The parties were both represented by counsel and each party testified at length. The judge had ample opportunity to judge their credibility and obviously found defendant's wanting.

As to issues with the interpretation, we note that defendant also speaks Tamil. And, as plaintiff notes, there is an audio recording of the proceedings before the trial court. Although defendant alleges the interpreter's errors were significant, he has failed to provide any examples in which the interpretation failed to capture plaintiff's testimony accurately. In short, defendant has failed to demonstrate any alleged inadequacies in the interpretation deprived him of a fair trial.[1] See State v. Guzman, 313 N.J. Super. 363, 379 (App. Div. 1998) (discussing standard for adequate translation of criminal trial proceedings).

---

[1] We also reject defendant's suggestion that the court erred in appointing an interpreter for plaintiff. N.J.S.A. 2B:8-1 requires each county to "provide interpreting services necessary for cases from that county in the Law Division and the Family Part of the Chancery Division" and that such interpreters "shall

(continued)

Finally, although we acknowledge defendant's point that the drafters of the Prevention of Domestic Violence Act did not intend the commission of any of the incorporated criminal statutes "automatically would warrant the issuance of a domestic violence order," Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995), the court acted well within its discretion in determining a final restraining order was necessary to protect plaintiff from further abuse on the evidence in the record. See Silver, 387 N.J. Super. at 127. Although the testimony of the history of domestic violence between the parties was limited, the court found defendant engaged in a physical assault on plaintiff over the course of two days. We are thus well satisfied under these circumstances that plaintiff proved a restraining order was necessary for her protection and safety. See McGowan v. O'Rourke, 391 N.J. Super. 502 (App. Div. 2007) (affirming FRO based on a single act of harassment).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

be appointed and shall perform their duties in the manner established by the Chief Justice." Standard 1.2 of the "New Jersey Judiciary Language Access Plan" provides that "[a]n interpreter shall be provided to any court user when either that court user or that court user's attorney represents that the person is unable to understand or communicate proficiently in English." See Administrative Directive #01-17, "New Jersey Judiciary Language Access Plan" (Jan. 10, 2017). We note in that regard the testimony of one of the responding police officers of his difficulty in understanding plaintiff because of the "language barrier."