**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5319-15T2

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JAMES RUSSELL,

      Defendant-Appellant.

_____

          Argued October 30, 2018 – Decided May 15, 2019

          Before Judges Geiger and Firko.

          On appeal from Superior Court of New Jersey, Law Division, Ocean County, Indictment Nos. 06-05-0869 and 09-01-0109.

          Michael A. Priarone, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Michael A. Priarone, on the brief).

          Shiraz I. Deen, Assistant Prosecutor, argued the cause for respondent (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel J. Marzarella, Deputy Executive Assistant Prosecutor, of counsel; Shiraz I. Deen, on the brief).

PER CURIAM

Defendant James Russell appeals from an April 29, 2016 order denying his petition for post-conviction relief (PCR) without an evidentiary hearing. Tried to a jury, Russell and two co-defendants were convicted of the murder of Jose Francisco Olivares and related crimes. Russell and two co-defendants were subsequently tried and convicted of a second murder and related charges arising out of an attempt to prevent a witness from testifying about the Olivares murder. Russell sought PCR from each of the convictions. We affirm.

I.

Indictment No. 06-05-0869

Russell and co-defendants Jamal D. Scott and Tyleek J. Baker were convicted of the murder of Olivares in a Lakewood barbershop. The State contended Baker shot Olivares, and Russell and Scott conspired with Baker and acted as his accomplices.

We recounted the underlying facts in our consolidated opinion on direct appeal of the convictions and sentences entered against Russell, Scott, and Baker, and need not repeat them at length here. State v. Scott, Nos. A-3455-08, A-4794-08, and A-4841-08 (App. Div. April 20, 2012). Pertinent to this appeal, the evidence at trial revealed:

[A]t approximately 4:00 p.m. on February 7, 2006, Jason Vega arrived at the Man, Woman and Child Barbershop in Lakewood. Vega's brother, Ramon, and Vega's friends, Christian Vivar Granados and Olivares, known as "Hefe," were already there. Jose Silva was one of the barbers at the shop that day.

Vega . . . walked through another room where approximately nine people were gathered, stopping briefly to say hello. Baker, who was known as "Respect," was playing chess with another person when he began "mocking" Vega. Vega ignored Baker's "mocking" until he heard Baker say to someone on the phone, "Jason Vega and his boys are plotting on me." Not knowing to whom Baker was speaking, Vega was upset and thought he was going to "have to . . . watch[] [his] back." Vega challenged Baker to a fight "and he accepted." Vega "asked him to step outside . . . to settle it[,] basically, fistfight." James Bellamy . . . claimed, however, that Baker was not involved in any arguments or confrontations.

According to Vega, after Baker accepted the challenge, Baker asked someone if Hefe was in the shop. When told he was, Baker ran out the back door. Vega waited for Baker in front of the barbershop for approximately fifteen minutes and then left.

Shortly after this confrontation, Granados saw Russell, whom he knew as "Gotti," and Scott, who was known as "High-Five," enter the barber shop and walk to the back. They stayed in the store for a couple of minutes before leaving.

Silva was arranging his barber station when he saw Baker, who he knew as a regular customer, come in with two other men. When the men entered, Olivares was seated, but, as he stood up from his chair, Baker

3

shot him six times. . . . Silva could not identify the two men with Baker.

Granados was getting his hair cut when he saw Baker, Russell, and Scott walk into the shop. He heard Baker say, "Where's that nigger that have a beef with me?" Olivares stood up, said, "What's up?," and Baker shot him. Granados explained that during the shooting, Russell stood on Baker's left and Scott on his right. Both men had their hands crossed in front of them, kept a straight face, and did not appear upset or surprised.

[Id. at 9-11.]

Alexander Truyenque testified he saw three African-American men "walk in the barber shop and shoot somebody." Id. at 11. He stated "the one 'in the middle took out a weapon and fired several shots at the victim' who was sitting in the corner." Ibid. "When shown a photographic array that included Russell's photo, Truyenque stated that the photograph 'look[ed] like' one of the men who stood by the shooter." Ibid.

Ramon testified he saw three men enter the barbershop and one shoot Olivares as the other two stood on either side. All three men ran from the barbershop after the shooting. Ibid. Ramon observed "a silver four-door car, possibly a Toyota, fleeing the scene." Ibid.

On June 1, 2006, an Ocean County grand jury returned Indictment No. 06-05-0869, which charged all three defendants with first-degree murder, N.J.S.A.

2C:11-3 (count one), and first-degree conspiracy to commit murder, N.J.S.A. 2C:11-3 and N.J.S.A. 2C:5-2 (count two). Baker was also charged with second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count three); third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count four); and second-degree possession of a firearm by certain persons, N.J.S.A. 2C:39-7(b)(1) (count five).

Defendants were tried jointly and convicted by a jury on all counts. Baker subsequently pleaded guilty to count five.

All three defendants moved for a new trial and judgment of acquittal notwithstanding the verdict. The trial court denied the motions. After merging the conspiracy count into the first-degree murder count for sentencing purposes, the court sentenced Russell to a life sentence subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

All three defendants appealed.[1] After we consolidated the appeals, we affirmed the convictions and sentences imposed as to all three defendants, with

---

[1] Russell raised the following arguments on direct appeal: (1) the photographic identifications of defendant were impermissibly suggestive; (2) defendant was denied a fair trial by the State's exercise of a peremptory challenge on constitutionally impermissible grounds to strike an African-American juror; (3) the verdict was against the weight of the evidence; (4) the admission of improper opinion testimony denied defendant a fair trial; (5) defendant was denied a fair

one exception; we remanded the consecutive sentence Baker received on the certain persons offense for reconsideration. Russell's petition for certification was denied. State v. Russell, 212 N.J. 431 (2012).

Indictment No. 09-01-0109

The second indictment charged Russell, Scott, Lee C. Reeves, and Trishawn F. Cochran – all members of the Bloods street gang[2] – with offenses relating to a plot to prevent Granados from testifying as an eyewitness for the State regarding the murder of Olivares, the victim in Indictment No. 06-05-0869.

We recounted the underlying facts in our consolidated opinion on direct appeal of the convictions and sentences entered against Russell, Scott, Reeves, and Cochran, and need not repeat them at length here. State v. Scott, Reeves, Russell, and Cochran, Nos. A-2580-09, A-4100-09, A-4101-09, and A-6279-09 (App. Div. April 16, 2013). Pertinent to this appeal, the evidence at trial

---

trial by the trial court's repeated denials of mistrial motions based upon the State's belated provision of discovery and violation of an order prohibiting any mention of acts of retaliation against a witness; (6) the misconduct of Baker's trial counsel denied Russell a fair trial; (7) the Appellate Division erred in reversing the trial court's ruling precluding the use of the defendants' street names at trial; (8) the trial court erred by denying Russell's motion for a new trial; (9) the cumulative effect of the trial errors denied Russell a fair trial; (10) Russell's sentence was excessive; and (11) the failure to perform the requested read-back of testimony denied Russell a fair trial.

[2] Russell is a member of the Black Guerilla Gangster Piru set of the Bloods.

revealed Granados was an eyewitness to the Olivares murder. Id. at 4. Granados was identified in the police reports and other documents produced during discovery. Ibid. At a plea cut-off hearing, Scott and Russell acknowledged they had reviewed the discovery materials with counsel. Ibid. Following jury selection, the trial judge advised defendants that opening statements and witness testimony would begin on October 14, 2008. Members of the Bloods then made plans to kill Granados to prevent him from testifying. Id. at 5-7.

Defense investigators discovered Granados was staying with his girlfriend, Alisa Morales, and her mother, Theresa Vasquez, at an apartment in Lakewood. Id. at 8. Shortly before 6:00 a.m. on the day testimony was to begin, Vasquez was sleeping on a sofa in the living room of the apartment. Ibid. Morales and Granados, who were in the bedroom, heard gunshots. Ibid. Upon entering the living room, Morales and Granados saw the front door pushed in and broken off the door jamb; they also saw Vasquez bleeding on the sofa from multiple gunshot wounds, but they did not see the shooter. Ibid. Vasquez was taken by ambulance to a nearby hospital, where she died. Id. at 9.

Subsequent investigation revealed the scheme to kill Granados, the acts taken in furtherance of the conspiracy, and the mistaken killing of Vazquez rather than Granados. Reeves was the shooter; he admitted to two others he had

kicked Vazquez's door open, shot whoever was on the couch, and ran off when the gun jammed. Id. at 13. The living room was dark, leading Reeves to shoot the wrong person. Id. at 17.

Attempts were made to hide the handgun and a shell casing. Despite those attempts, they were recovered by investigators. The shell casing was hidden beneath a sewer grate in Camden. Another shell casing was recovered at the scene of the crime. The handgun was forensically linked to both shell casings. Id. at 16. In addition, another person provided further information about the killing, including an admission by Reeves. Id. at 15-16.

An Ocean County grand jury returned Indictment No. 09-01-0109 charging Russell, Scott, Reeves, and Cochran with: first-degree conspiracy to commit murder, N.J.S.A. 2C:11-3(a) or (b) and N.J.S.A. 2C:5-2 (count one); first-degree murder, N.J.S.A. 2C:11-3(a) or (b) (count two); attempted murder, N.J.S.A. 2C:11-3(a)(1) and N.J.S.A. 2C:5-1 (counts three and four); second-degree burglary, N.J.S.A. 2C:18-2 (count five); possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count six); second-degree conspiracy to commit witness tampering, N.J.S.A. 2C:28-5(a) and N.J.S.A. 2C:5-2 (count seven); and first-degree witness tampering, N.J.S.A. 2C:28-5(a) (count eight). Count nine charged co-defendant Joseph Powell, also an admitted member of

the Bloods street gang, with second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b).[3]

Defendants were tried jointly. Reeves testified at trial, and freely admitted he murdered Vazquez. Id. at 16. Russell, Scott, and Cochran did not testify or call any witnesses. Ibid. Based upon the evidence adduced at trial, the jury convicted Russell, Scott, and Reeves of all counts. The jury found Cochran guilty of both witness tampering counts but acquitted him of the remaining charges.

Russell, Scott, Reeves, and Cochran appealed their convictions and sentences. We consolidated the appeals. Each defendant raised numerous issues on direct appeal.[4] We affirmed the convictions and sentences as to all four defendants in all respects. Id. at 3.

_____

[3] Powell pleaded guilty to that crime, as well as to the conspiracies charged in counts one and seven.

[4] Russell raised the following arguments on direct appeal: (1) the trial court erred in denying his motion for a change of venue; (2) the trial court erred in denying severance and not conducting a separate trial as to each defendant; (3) the prosecutor committed a Batson/Gilmore error, Batson v. Kentucky, 476 U.S. 79 (1986); State v. Gilmore, 103 N.J. 508 (1986); (4) the trial court erred by permitting a detective to testify as a gang expert; (5) the trial court erred by permitting Russell's statements in another criminal case to be used as substantive evidence against him in this case; (6) hearsay by alleged co-conspirators was improperly admitted into evidence against Russell during the State's case-in-

9

The PCR Proceedings

On November 28, 2012, Russell filed a pro se PCR petition as to the Olivares homicide proceedings. The petition asserted two grounds for relief: (1) the trial judge had previously prosecuted Baker and (2) ineffective assistance of appellate counsel in failing to argue the arrest warrant was defective.

Counsel was appointed to represent Russell and submitted a brief and exhibits. PCR counsel averred none of Russell's claims were procedurally barred. The brief asserted the following grounds for relief: (1) the trial judge had previously prosecuted Baker; (2) trial counsel was ineffective in failing to produce a witness who would have exculpated Russell; (3) trial counsel was ineffective in failing to ask the State's star witness to inform the jury that Russell was not involved in a conspiracy to commit a homicide; (4) trial and appellate counsel were ineffective in failing to challenge unlawful portions of the jury instructions that pertained to Russell's street name, that misstated the evidence, and that improperly reduced the State's burden of proof; (5) trial and appellate counsel were ineffective in failing to challenge several instances of prosecutorial

_____

chief (not raised below); (7) prosecutorial misconduct caused an unfair trial; (8) the right to a fair trial was infringed due to juror issues that arose during trial and deliberations; (9) discovery violation should have precluded evidence being introduced at trial; and (10) his sentence was improper and excessive.

misconduct; (6) trial counsel was ineffective in failing to ensure the prosecutor adhered to the parameters set by the Appellate Division for comments on Russell's street name "Gotti;" and (7) the cumulative effect of trial and appellate counsels' errors warrant relief.

On November 20, 2013, Russell filed a pro se PCR petition as to the Vazquez homicide proceedings. The petition asserted two grounds for relief: (1) ineffective assistance of trial counsel in failing to investigate potential witnesses and (2) the State's Brady[5] violation in failing to disclose material evidence.

Counsel was appointed to represent Russell. Counsel argued trial counsel was ineffective by failing to: (1) consult with Russell, interview and call as a witness an FBI agent with knowledge of co-defendant's trial counsel's criminal behavior, investigate and call witnesses who could provide exculpatory evidence, investigate potential defenses, research critical words and phrases, object to the trial court referring to Russell as "Gorilla Gotti,"[6] and subject the State's evidence to a meaningful challenge; (2) move for recusal; (3) renew the

---

[5] Brady v. Maryland, 373 U.S. 83 (1963).

[6] Russell contends he went by the gang name "Guerilla Gotti" not "Gorilla Gotti." We note guerilla and gorilla are homophones.

motion for severance after Powell decided to testify against Russell and after Reeves raised duress as a defense; (4) prevent the jury from hearing irrelevant character evidence; (5) engage in effective jury selection; (6) give an adequate closing statement; and (7) prevent or seek remedies for prosecutorial misconduct.[7] PCR counsel also argued the cumulative effect of trial counsel's errors warranted reversal and that appellate counsel was ineffective.

Without objection by the parties, the Ocean County PCR court decided to hear both of Russell's PCR petitions and the petitions filed by Baker, as to the Olivares murder, Scott, as to the Olivares and Vazquez murders, and Reeves, as to the Vazquez murder, together. Scott filed a motion for change of venue, and Russell and Baker orally joined in Scott's motion on the return date. The court granted the motion; the petitions were transferred to Monmouth County.

Defendants then sought discovery of juvenile files pertaining to Baker, claiming the trial judge prosecuted those cases in his prior capacity as an assistant prosecutor in the Ocean County Prosecutor's Office. The Monmouth County PCR court ordered the Prosecutor's Office to produce fourteen internal

---

[7] Russell claimed trial counsel neglected to object to the prosecutor's: (a) attempt to mislead the jury; (b) arguments that were not based upon the evidence in the record; and (c) attempts to inflame the passions of the jury.

files concerning Baker's juvenile delinquency charges for in camera review. Counsel were permitted to review the files for any references to the trial judge.

The review of Baker's juvenile files revealed nearly thirty documents, dated between 1993 and 1998, which indicated varying degrees of involvement of then-assistant prosecutor Wendel E. Daniels in nine juvenile delinquency cases filed against Baker. The documents are more fully described in Schedule A attached to this opinion. In sum, the documents show that the trial judge was involved in some capacity as an assistant prosecutor in at least nine juvenile cases involving Baker. In four of those cases, court appearance sheets suggest he was involved in a supervisory role. In one case, assistant prosecutor Daniels filed four juvenile delinquency complaints against Baker.

In response to the interrogatories issued by the PCR court, the trial judge certified he was employed by the Ocean County Prosecutor's Office from 1988 to 1999. During that time, he was an assistant prosecutor from 1988 to 1993. As an assistant prosecutor, he "tried approximately fifteen jury criminal trials," and during that time he "would have conferenced between 150-200 adult cases, which included pleas and plea negotiations, sentencings, motions, and violations of probation." He further certified that from 1993 to 1999, as supervisor of the

Juvenile Prosecution Unit, he would have tried over twenty cases per year and conferenced over 500 cases.

Concerning the trial, the trial judge certified that Baker's trial counsel "at no time communicated" to him that he "had a potential conflict of interest with" Baker. He further certified that at the time he presided over the trial in 2008, he "did not have any recollection of having previously prosecuted [Baker] while [he] was an assistant prosecutor." He also certified that "[i]n the event that [he] had any documentary or independent recollection of having prosecuted Tyleek Baker, or of having received any request for disqualification, [he] would have transferred the case to another judge."

The record also shows that since the mid-1980s, the trial judge volunteered with the Omega XIII community-based youth mentoring program in Lakewood. Reeves participated in the Omega XIII program in 2005 and 2006.

The trial judge raised the issue of his involvement in the Omega XIII program in an August 11, 2009 letter to all counsel. The judge noted he had no recollection of Reeves from the program, it was unlikely he would have known Reeves because he was not involved in the details of the program, maintained distance from the participants, and avoided discussion of any of the participant's

14

juvenile cases. The trial judge stated he did not see a basis for disqualification, and requested each party's position regarding the issue.

The trial judge addressed the issue with counsel in open court. Defense counsel unanimously agreed the judge's participation in the Omega XIII program did not create a conflict. In particular, counsel for Reeves stated his client had no objection to the trial judge continuing to hear the case. This issue was not subsequently raised by any defendant prior to, or during, the trial. Nor was it raised by any defendant other than Baker on direct appeal of the first trial.[8]

In his answers to interrogatories, the trial judge stated he has "been an active member in the Omega XIII program from the mid[-]1980s to the present." "As a mentor, [he] offer[s] friendship, guidance, and support to the male participants." He has served as both an assistant prosecutor and as a judge while mentoring in the Omega XIII program. The trial judge certified he "did not

---

[8] In a supplemental pro se brief, Baker alleged a conflict with the trial judge because the trial judge had prosecuted him as a juvenile. Baker claimed he brought the conflict to the attention of his trial counsel, who informed him he spoke to the trial judge and assured him "the trial judge would be fair." Scott, slip. op. at 47-48. However, the record did not disclose any discussion took place between trial counsel and the trial judge. Id. at 49. We, thus, declined to consider the conflict issue, and stated it would be "more appropriately addressed in the context of post-conviction relief." Ibid.

recall throwing Lee Reeves out of the Omega XIII mentorship Program in 2005." In 2008, he did not recall speaking with Lee Reeves's mother regarding Reeves's participation in the program. In 2009, he did not recall ever personally counselling Reeves while he was in the program in 2004 or 2005, or taking Reeves to a banquet, or a seminar as part of his participation in the program, or taking Reeves to a NCAA basketball game in 2004. The trial judge further certified that after speaking with the president of the Lakewood Chapter of Omega XIII in 2015, the president confirmed the accuracy of the judge's answers to the interrogatories.

The PCR court consolidated the petitions filed by Russell, Scott, and Baker for both cases and the petition filed by Reeves in the Vazquez homicide proceedings. During a status conference, the PCR court discussed how the case should proceed in light of the State raising the issue of whether Baker's co-defendants had standing to pursue the conflict issue raised by Baker. Guided by our decision in State v. Presley, 436 N.J. Super 440 (App. Div. 2014), the PCR court suggested the State proceed by motion to dismiss if it intended to pursue lack of standing. In response to the court's suggestion, defendant's counsel requested the conference and all subsequent conferences be placed on the record. At a subsequent status conference, the PCR court clarified:

16

> I thought the most appropriate way to deal with [the trial judge's] involvement in the underlying [juvenile] cases was to have a series of written questions formulated that would be agreed upon by all counsel and parties to be responded to under oath by [the trial judge] as opposed to having different investigators go and see him.
>
> I thought that the areas of inquiry might be guided by that which is set forth [in the] <u>Presley</u> decision.

The PCR court contemplated the best way to proceed given the size of the record, and concluded the standing issue should be decided by way of formal motion, responses, and oral argument, before conducting the PCR hearing.[9] The PCR court crafted a procedure in which the defendants could submit a list of inquiries to Judge Daniels without investigators and counsel personally interviewing him. The interrogatories would then be vetted by the PCR court before submission to Judge Daniels.

Scott's counsel objected to the procedure, arguing the defendants had the right to personally question the trial judge. Scott's counsel also argued the procedure was deficient because a number of questions were struck before the list was submitted to the trial judge. Russell and Scott moved for recusal. The

---

[9] Notably, the State did not move to dismiss the petition based on lack of standing. Instead, the State raised lack of standing as part of its opposition to granting PCR.

PCR judge issued an oral decision and orders denying the motions. The court then heard oral argument on defendants' PCR petitions.

In a comprehensive and well-reasoned seventy-page written opinion, the PCR judge determined Russell failed to establish a prima facie case of ineffective assistance of counsel to warrant relief or an evidentiary hearing. As to the trial judge's conflict with Baker, the PCR court noted Baker certified he told his trial counsel prior to trial that he had been personally prosecuted by the trial judge on numerous occasions. Therefore, Baker could have raised this issue pretrial, during trial, at pre-sentencing, at sentencing, or at any time prior to November 2010, when he first raised the issue in connection with seeking a remand from the Appellate Division. The PCR court further noted Baker raised numerous arguments in his motion for acquittal but not the conflict issue. The PCR judge stated, "[t]o say that Baker could not have raised the disqualification challenge then is illogical."

The PCR court further concluded Baker did not meet his burden of showing a constitutional violation took place. The PCR judge found there was no allegation of actual bias on the part of the trial judge and no evidence of partiality or knowledge of disqualifying facts. Indeed, the trial judge's interrogatory answers stated he "did not have any recollection of having

previously prosecuted [Baker] while [he] was an assistant prosecutor." The PCR judge found there was no corroborating evidence or substantiation of Baker's allegation that his trial counsel advised the trial judge of his prior prosecution of Baker. In that regard, the PCR court noted the trial judge certified that "at no time" did Baker's trial counsel "communicate to me that I had a potential conflict of interest with his client."

The PCR judge noted the trial judge's ruling prohibiting the use of gang names favored defendants. The PCR judge also considered that a jury had found Baker guilty, providing another constitutional protection. The judge found Baker did not show a reasonable probability that, but for trial counsel's unprofessional errors, the result of the proceeding would have been different. Applying the Presley factors, including the passage of time between the juvenile prosecutions and this case, the trial judge being unaware of any conflict when he tried the case, and the absence of bias or partiality during the trial, the PCR judge concluded Baker's disqualification argument must fail.

With regard to the claim the trial judge was disqualified from presiding over Indictment No. 09-01-0109, because the judge had terminated Reeves from the Omega XIII program, the PCR court found no constitutional violation. The PCR judge noted the trial judge's answers to interrogatories stated he had no

recollection of terminating Reeves from the program, ever speaking to Reeves's mother, ever personally counseling Reeves, or ever taking Reeves to a banquet, seminar, or basketball game as alleged.

The PCR court found no substantiated allegation that the judge "was in any way partial or biased." She noted there was no objection to the trial judge presiding over the case, Reeves testified at trial and freely admitted he murdered Vasquez, and Reeves made several corroborating statements to witnesses. Moreover, Reeves did not argue on direct appeal that his conviction should be reversed because the trial judge was disqualified due to a conflict. Because defendants did not demonstrate actual bias on the part of the trial judge that would call into question the fairness of the Vasquez murder trial, the PCR court found the claims did not rise to the level of a constitutional violation and were not suited for PCR.

Finally, with regard to Russell and Scott's disqualification argument, the PCR court found they lacked standing to challenge the constitutionality of the trial judge trying the case. The PCR court relied on language from Presley, where we concluded, "[i]n the absence of a constitutional defect . . . a judge with a disqualifying conflict as to one defendant is an insufficient basis for the other defendants to seek the nullification of orders entered by the judge and the

additional relief sought." 436 N.J. Super. at 453. Thus, the PCR court reasoned even if Baker and Reeves's conflict claims had merit, which the court found they did not, Russell and Scott's conflict claims would still fail.

This appeal followed. Russell raises the following points:

> I. THE PCR COURT ERRED IN FAILING TO RECUSE ITSELF FROM THIS MATTER AND ITS FAILURE TO DO SO REQUIRES THAT THIS MATTER BE REMANDED FOR A NEW HEARING BEFORE AN IMPARTIAL COURT.
>
> II. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S PETITION FOR POST[-]CONVICTION RELIEF AND IN DENYING AN EVIDENTIARY HEARING ON DEFENDANT'S CLAIMS.

## II.

We first address Russell's contention the PCR judge erred in failing to recuse herself from this matter. He claims the PCR judge was biased based on her suggestion the State move to dismiss the petitions, her demeanor, her incidental rulings, and her denial of the opportunity to interview the trial judge. Russell argues the PCR judge's solicitation of a motion by the State to dismiss the petitions occurred before she had read any of petitioners' briefs. Russell contends these circumstances demonstrate the PCR judge was predisposed to deny his petition.

21

Russell moved to recuse the PCR judge. In a supporting certification, PCR counsel certified that during an initial status conference conducted outside the courtroom and off the record, "[t]he PCR judge expressed a negative attitude towards the four petitions for [PCR] filed by James Russell and Jamell Scott." At one point, the PCR judge asked the assistant prosecutor, "why don't you file a motion to dismiss[?]" At that point, Scott's attorney demanded the remainder of the conference be held on the record. PCR counsel described the remainder of the conference as "contentious." He alleged: "The PCR [j]udge's tone and facial expressions, which are not reflected by the record, were hostile towards defense counsel." PCR counsel represents that during a status conference conducted ten weeks later, "the PCR [j]udge continued to be hostile towards defense counsel. The PCR [j]udge's tone and facial expressions were harsher than the previous status conference."

Counsel also claims the PCR judge "disregarded" a letter he sent and had otherwise "expressed an unwillingness to listen." He further claims the judge "was upset that I directed an investigator to serve a subpoena on a woman" who was present in court during a prior status conference. Through inadvertence, the subpoena was meant to be labelled a subpoena duces tecum. The judge admonished counsel for not providing a copy of the subpoena to the assistant

prosecutor. Counsel further claims the judge was angry because counsel did not "prove" to the prosecutor that he represented Russell on the first petition even though the prosecutor knew prior designated counsel was deceased. The judge directed counsel to file a substitution of attorney, even though the attorney of record remained the Public Defender. Counsel also points to the judge's refusal to consider two reply briefs submitted ten days late, while affording extensions to the State. The PCR judge denied the recusal motion.

The State argues the PCR judge's suggestion that the State move to dismiss the petition was not indicative of any bias on her part against Russell or the co-defendants. The PCR judge did not initiate discussion of lack of standing. Instead, the State raised lack of standing during the conference and the judge responded by suggesting that issue could be raised by motion to dismiss.

Motions for disqualification "are entrusted to the sound discretion of the judge and the judge's decision is subject to review for abuse of discretion." State v. McCabe, 201 N.J. 34, 45 (2010) (citing Panitch v. Panitch, 339 N.J. Super. 63, 66, 71 (App. Div. 2001)). "We review de novo whether the proper legal standard was applied." Ibid.

Judges "must avoid all impropriety and appearance of impropriety." Id. at 43 (quoting DeNike v. Cupo, 196 N.J. 502, 514 (2008)). "In other words,

judges must avoid acting in a biased way or in a manner that may be perceived as partial." DeNike, 196 N.J. at 514. Both Canon 3(C)(1) of the Code of Judicial Conduct and Rule 1:12-1 focus directly on the subject of disqualification.[10] Canon 3(C)(1) states "[a] judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." Similarly, Rule 1:12-1(g) directs judges not to preside over a matter "when there is any . . . reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so."

"Our rules, therefore, are designed to address actual conflicts and bias as well as the appearance of impropriety." McCabe, 201 N.J. at 43. Therefore, "'the mere appearance of bias may require disqualification'" even "without any proof of actual prejudice." Presley, 436 N.J. Super. at 448 (quoting Panitch, 339 N.J. Super. at 67). "However, before the court may be disqualified on the ground of an appearance of bias, the belief that the proceedings were unfair must be objectively reasonable." Ibid. (quoting Marshall, 148 N.J. at 279).

Following those principles, the Court adopted "the following standard to evaluate requests for recusal: 'Would a reasonable, fully informed person have

---

[10] Effective September 1, 2016, Canon 3(C)(1) of the Code of Judicial Conduct became Canon 3, Rule 3.17(B).

doubts about the judge's impartiality?'" McCabe, 201 N.J. at 44 (quoting DeNike, 196 N.J. at 517). As our Supreme Court has noted, "DeNike does not set forth any bright-line rules." State v. Dahl, 221 N.J. 601, 607 (2015). Instead, "the standard calls for an individualized consideration of the facts in a given case." Ibid.

Applying that standard to the facts of this case, we discern no abuse of discretion by the PCR judge in declining to recuse herself. Russell has not demonstrated the PCR judge was biased. Her suggestion that the State file a motion to determine Russell's standing to raise the alleged conflict of the trial judge with a co-defendant was prudent, not improper. By addressing that issue preliminarily, the court could determine if a full PCR hearing was necessary, thereby promoting judicial economy and conserving judicial resources. To be sure, standing should be determined prior to a hearing on the merits, not after. On this record, no reasonable, fully informed person would have doubts about the PCR judge's impartiality.

### III.

We next address Russell's claim the PCR court erred by denying his petition without an evidentiary hearing. At the time of defendant's petition, our rules provided four grounds for PCR: "(a) 'substantial denial in the conviction

proceedings' of a defendant's state or federal constitutional rights; (b) a sentencing court's lack of jurisdiction; (c) an unlawful sentence; and (d) any habeas corpus, common-law, or statutory grounds for a collateral attack." State v. Preciose, 129 N.J. 451, 459 (1992) (quoting R. 3:22-2).[11] A petition for PCR "is not a substitute for a direct appeal, and a defendant who relies upon grounds which could have been raised in a prior proceeding may be barred from post-conviction relief." State v. Guzman, 313 N.J. Super. 363, 372 (App. Div. 1998) (citing Preciose, 129 N.J. at 459).

A PCR court deciding whether to grant an evidentiary hearing "should view the facts in the light most favorable to a defendant to determine whether a defendant has established a prima facie claim." Preciose, 129 N.J. at 462-63. Nevertheless, PCR courts need not conduct an evidentiary hearing unless the defendant establishes a prima facie case for relief and "there are material issues of disputed fact that cannot be resolved by reference to the existing record." R. 3:22-10(b). "To establish such a prima facie case, the defendant must demonstrate a reasonable likelihood that his or her claim will ultimately succeed

---

[11] Effective September 1, 2018, Rule 3:22-2(e) provides the following fifth basis for relief: "A claim of ineffective assistance of counsel based on trial counsel's failure to file a direct appeal of the judgment of conviction and sentence upon defendant's timely request."

A-5319-15T2

on the merits." State v. Marshall, 148 N.J. 89, 158 (1997). See also State v. Porter, 216 N.J. 343, 355 (2013) (noting the defendant "must do more than make bald assertions" to establish a prima facie claim for relief (quoting State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999))). As the PCR court did not hold an evidentiary hearing, we undertake a de novo review. State v. Parker, 212 N.J. 269, 278 (2012).

Under the Sixth Amendment, a criminal defendant is guaranteed the effective assistance of legal counsel in his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). To establish a deprivation of that right, a convicted defendant must satisfy the two-part test enunciated in Strickland by demonstrating that: (1) counsel's performance was deficient, and (2) the deficient performance actually prejudiced the accused's defense. Id. at 687; accord State v. Fritz, 105 N.J. 42, 58 (1987) (adopting the Strickland two-part test in New Jersey). "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Fritz, 105 N.J. at 52 (quoting Strickland, 466 U.S. at 687); accord State v. Castagna, 187 N.J. 293, 314-15 (2006). Defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." State v. Harris, 181 N.J. 391, 432 (2004) (quoting Strickland, 466 U.S. at 694).

Russell renews the arguments presented to the PCR court and asserts that the court erred in denying his motion for additional discovery and an evidentiary hearing on his claims of ineffective assistance of trial counsel. We disagree. The PCR judge thoughtfully addressed each of Russell's arguments in her comprehensive written decision. After reviewing these arguments in light of the record and applicable legal principles, we conclude they are without merit. We affirm substantially for the reasons set forth in the PCR judge's comprehensive written decision. We add the following comments.

## A.

Our court rules do not authorize discovery in PCR proceedings. Marshall, 148 N.J. at 268. "[O]nly in the unusual case will a PCR court invoke its inherent right to compel discovery." Id. at 270. "PCR 'is not a device for investigating possible claims, but a means for vindicating actual claims.'" Ibid. (quoting People v. Gonzalez, 800 P.2d 1159, 1206 (Cal. 1990)). Additionally, "any PCR discovery order should be appropriately narrow and limited." Ibid. Nonetheless, "where a defendant presents the PCR court with good cause to order the State to supply the defendant with discovery that is relevant to the

defendant's case and not privileged, the court has the discretionary authority to grant relief." Ibid.

We have thoroughly reviewed the PCR record and exhibits and conclude that the PCR court did not abuse its discretion in ruling on defendants' discovery motions. The PCR court recognized that additional information was needed to determine whether defendants made a prima facie showing. The PCR judge permitted counsel to review the internal juvenile files maintained by the Prosecutor's Office involving the trial judge's prosecution of Baker. The PCR court also sent interrogatories to the trial judge to obtain the necessary additional information.

The trial judge's interrogatory answers revealed he had no recollection of prosecuting Baker as a juvenile. His answers further stated that Baker's trial counsel never raised a potential conflict of interest, but, had the issue been raised, he would have transferred the case to another judge.[12] They also revealed his involvement in the Omega XIII program in which Reeves was a participant and the limited nature of his personal interaction with Reeves.

Based on our independent review of the record, we decline to disturb the PCR court's determination of the type and scope of discovery it would permit.

---

[12] The trial judge was the criminal presiding judge at the time of both trials.

Defendants did not demonstrate good cause to compel additional discovery. We discern no abuse of discretion by the PCR court in denying further discovery.

B.

We next address Russell's contention that the PCR court erred by rejecting his claim that his conviction and sentence must be set aside because the trial judge was disqualified from hearing the case due to his prior prosecution of Baker as a juvenile and his involvement in the Omega XIII program while Reeves was a participant. We disagree.

Defendants argue the PCR court erred by employing the standards adopted in Presley, 436 N.J. Super. at 463, to determine if the trial court's conflicts with Baker and Reeves violated Russell's constitutional right to a fair trial. In Presley, we determined the following non-exclusive list of factors were relevant to the analysis of challenges to searches and seizures on constitutional grounds:

> (1) the nature and extent of the judge's prior role as a prosecutor or attorney and the amount of time that passed since the disqualifying conduct;
>
> (2) the facts known to the judge at the time of the judicial act that is challenged;
>
> (3) the reasonableness of efforts made by the State and the judge to identify a conflict before judicial action is taken;

(4) the evidence of actual partiality on the part of the judge, including any evidence that his or her prior role affected the decision made;

(5) the length of delay in raising the issue and any reason for such delay;

(6) prejudice to the adverse party caused by the delay in raising the disqualification issue; [and]

(7) sufficiency of support for the warrant or order issued by the judge.

[Ibid. (footnote omitted).]

We explained no one factor is dispositive and "our analysis is informed by whether the nullification of orders and the suppression of evidence will serve the objective of the Code of Judicial Conduct 'to maintain public confidence in the integrity of the judiciary.'" Ibid. (quoting In re Advisory Letter No. 7-11 of the Supreme Court Advisory Comm., 213 N.J. 63, 71 (2013)).

While we are mindful that Presley involved search warrants issued by a judge who subsequently recused himself because he had previously prosecuted one of the defendants as an assistant prosecutor some seven years earlier, 436 N.J. Super. at 443-44, we discern no error by the trial court in utilizing the Presley factors as part of its analysis. As in Presley, many years had passed since the trial judge's prosecution of Baker, the conflict with Baker was first raised long after the proceedings in question, the judge did not recall his prior

31

prosecution of Baker, and the prior prosecution of Baker did not involve Russell or the other co-defendants.

Taking into account the totality of the circumstances, we conclude Russell did not demonstrate actual bias or prejudice to him or his co-defendants. The trial judge's prosecution of Baker as a juvenile would not cause a reasonable, informed person to have doubts about the judge's impartiality. We are likewise satisfied Russell's right to a fair trial was not violated. Accordingly, the undisclosed Baker conflict does not establish a prima facie case for PCR.

We also conclude the trial court properly determined Russell did not make out a prima facie case for PCR based on the trial judge's involvement in the Omega XIII program. The judge's role in the program was limited. It did not involve discussion of pending juvenile matters. The trial judge did not previously prosecute Reeves. No actual bias or prejudice was shown. The trial judge's participation in the Omega XIII program would not cause a reasonable, informed person to have doubts about the judge's impartiality. We are satisfied Russell's right to a fair trial was not violated. Accordingly, we hold the alleged Reeves conflict does not establish a prima facie case for PCR.

C.

Last, we briefly address Russell's remaining grounds. Our review of the record reveals Russell has not established a prima facie case of ineffective assistance of counsel. He has not shown that his counsel's alleged errors caused the requisite prejudice. To establish prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors," a different verdict would have resulted. Fritz, 105 N.J. at 52 (quoting Strickland, 466 U.S. at 694). The impact of counsel's alleged errors on a verdict turns primarily on the strength of the evidence against the defendant and how counsel's errors relate to that evidence. Where the case against the defendant is strong, counsel's performance, unless egregiously lacking, will not result in a different outcome. See State v. Pierre, 223 N.J. 560, 583 (2015) ("Important to the prejudice analysis is the strength of the evidence that was before the fact-finder at trial.").

The evidence against Russell and his co-defendants was overwhelming. Applying these principles, Russell has failed to show a reasonable probability that, but for counsel's alleged errors, the jury would have reached a different verdict. Absent a showing of prejudice, Russell was unable to establish a prima facie case of ineffective assistance of counsel to warrant an evidentiary hearing or PCR. Preciose, 129 N.J. at 462; R. 3:22-10(b).

33

Defendant's remaining arguments lack sufficient merit to warrant further discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5319-15T2

## SCHEDULE A

(1)    June 1, 1998 letter from an assistant deputy public defender (ADPD) to the court objecting to the disclosure of information related to Baker in Docket No. FJ-2690-98. The letter was copied to assistant prosecutor Daniels.

(2)    June 19, 1998 letter from an ADPD confirming another attorney was taking over Baker's case in Docket No. FJ-2690-98. The letter is copied to the court and supervising assistant prosecutor Daniels.

(3)    Undated letter from an ADPD to the court objecting to the disclosure of information related to co-defendant Baker in Docket No. FJ-15-2084-97. The letter was copied to supervising assistant prosecutor Daniels.

(4)    November 19, 1993 letter from an ADPD to assistant prosecutor Daniels notifying him of representation of Baker in Docket No. FJ-1249-94.

(5)    Handwritten notes from an unknown author concerning a juvenile matter involving Baker. Assistant prosecutor Daniels's name is written on one of the documents.

(6)    August 5, 1994 juvenile information disclosure notice signed by supervising assistant prosecutor Daniels. The notice does not reference Baker.

(7)    Time sheet for an unknown matter, presumably from the public defender, spanning October 1994 to 1995. The time sheet lists two one-hour "consultations" with assistant prosecutor Daniels.

(8)    August 1996 Notice of Disclosure of Juvenile Information, which is signed by supervising assistant prosecutor Daniels. The notice simply recites N.J.S.A. 2A:4A-60(f) and does not reference Baker.

(9)    December 1, 1993 court appearance sheet for matter Docket No. FJ-1249-94, referenced in (4) above. The sheet indicates the matter was a detention hearing and plea. The sheet lists assistant prosecutor Daniels. In the notation section, the handwritten notes discuss the probation officer's

A-5319-15T2

attempts to get Baker two residential programs and the need to provide discovery.

(10) November 17, 1993 court appearance sheet for a detention hearing in Docket No. FJ-1249-94, referenced in (4) above. The sheet lists assistant prosecutor Daniels. In the notation section, the handwritten note states: "Remand. [illegible] report to court to determine whether house arrest is appropriate."

(11) Undated handwritten notes from an unknown author regarding Docket No. FJ-1249-94.

(12) April 12, 1994 letter from an unknown ADPD to assistant prosecutor Daniels notifying him that the Public Defender's Office was retained to represent Baker in Docket No. FJ-2350-94.

(13) Juvenile Investigations Unit cover sheet containing several handwritten notes regarding Docket No. FJ-2690-98 involving Baker. It states the prosecutor assigned as "Daniels," however, an unknown author crossed out "Daniels" and wrote "Jackson" above the edit.

(14) July 2, 1998 letter from the court to a Ms. Wilson concerning Baker in Docket No. FJ-15-2690-98. The letter advised Wilson of her right to refer the claim of ineffective assistance of Baker's counsel to the Attorney Ethics Committee. The letter was copied to the prosecutor's office and the assistant prosecutor Daniel's name is handwritten on the letter.

(15) Juvenile Waiver to Adult Court regarding Baker in Docket No. FJ-2690-98.

(16) Undated juvenile prosecution calendar that lists assistant prosecutor Daniels for Docket No. FJ-2690-98, the case in which Baker was waived to adult court.

(17) January 3, 1995 court appearance sheet that lists assistant prosecutor Daniels. In the notation section it states, "1/23/95 dismissal as part of a plea agreement."

A-5319-15T2

(18)  February 14, 1995 court appearance sheet for Docket Nos. FJ-1642-95 and FJ-2227-95 that list assistant prosecutor Daniels. The notation section on each sheet states, "2 y[ea]rs to Jamesburg. Field placement with mental health component. State decided not to disclose because possible extraordinary harm to [illegible] – Mental health treatment needed." It is signed with assistant prosecutor Daniels's initials.

(19)  Juvenile delinquency case disclosure form setting forth the disposition of Docket No. FJ-1642-95. It is signed in assistant prosecutor Daniels's initials.

(20)  January 30, 1996 letter to Baker denying him entry to the Juvenile Intensive Supervision Program. A handwritten note on the letter is addressed to assistant prosecutor Daniels's initials. It states, "what do I do with this?" A handwritten response states, "Please file."

(21)  Juvenile Delinquency Public Disclosure form for Baker in Docket No. FJ-1269-97. A different assistant prosecutor is listed.

(22)  October 18, 1996 letter to the court from an ADPD objecting to the disclosure of Baker's identity in Docket No. FJ-1269-97. The letter is copied to supervising assistant prosecutor Daniels.

(23)  Notice of Parole Release for Baker in Docket No. FJ-1269-97 signed in assistant prosecutor Daniels' initials.

(24)  October 10, 1996 court appearance sheet for a detention hearing in Docket No. FJ-1269-97 that lists assistant prosecutor Daniels. It states the juvenile was remanded and sets a second hearing date.

(25)  Four juvenile complaints filed by assistant prosecutor Daniels against Baker in connection with Docket No. FJ-98-04-59. The search warrant issue date for each complaint is listed as September 9, 1997.

(26)  April 27, 1998 letter to assistant prosecutor Daniels advising the "case is good against Baker" in Docket No. FJ-2690-98.

(27) September 27, 1994 letter from an ADPD advising of his representation of Baker in Docket No. FJ-666-95. In a handwritten note, assistant prosecutor Daniels is mentioned as having the case.

(28) January 23, 1995 court appearance sheet in Docket No. FJ-1642-95 that lists assistant prosecutor Daniels. A handwritten note indicates count one to be dismissed and count two "guilty," with assistant prosecutor Daniels "to handle sentence."