**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2831-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DIKEN MICHELE, a/k/a
SHAMAN CHAMBERS,
MICHELLE DIKEN,
SHERMAINE MICHAEL,
DIKEN MICHELLE,
DICKENSON MITCHEL,
and BIKEN MITCHELL,

     Defendant-Appellant.

_____

Submitted May 30, 2024 – Decided August 5, 2024

Before Judges Firko and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment Nos. 14-05-0364 and 14-05-0367.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Monique D. Moyse, Designated Counsel, on the brief).

William A. Daniel, Union County Prosecutor, attorney for respondent (Michele C. Buckley, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Diken Michele appeals from March 11, 2021[1] and January 14, 2022 Law Division orders entered by Judge Lisa Miralles Walsh denying his petition for post-conviction relief (PCR). In 2015, defendant was tried before a jury and convicted of first-degree robbery and related weapons offenses, including possession of a large capacity magazine and possession of a firearm by a previously convicted felon. Defendant contends his trial counsel rendered ineffective assistance on numerous grounds. He also contends his appellate counsel rendered ineffective assistance. After carefully reviewing the record in light of the governing legal principles and arguments of the parties, we affirm substantially for the reasons set forth in Judge Walsh's thorough written opinions.

---

[1] The March 11, 2021 order granted defendant's request for an evidentiary hearing limited to his ineffective assistance claim regarding "being brought out before an already seated jury during his trial."

A-2831-21

I.

We discern the following pertinent facts and procedural history from the record.  Shortly after midnight on January 26, 2014, the victim, L.V.[2], parked her car on the street adjacent to the club in Elizabeth where she worked.  The area was well lit.  After she got out of her car and began collecting her things from the trunk, a man approached her and said, "give me that."

Initially, L.V. thought the man was a bouncer from the club and handed him her dance bag and makeup case saying, "thank you. You're a life saver." When the man asked L.V. for her car keys, she realized something was wrong, which was confirmed when he told her, "you're being robbed, what you think." She saw the robber was holding a small black gun pointed at her waist.  She screamed and gave the man her purse and car keys. Her cell phone was in the purse.  The robber was dressed in a black hoodie, black pants, was of "African descent," and wore long dreadlocks pulled back in a "skully."  He fled across the street and got into the driver's seat of a parked red car.  The car made a U-turn and drove up the street.  L.V. identified the getaway car as either a Buick or an Oldsmobile.

---

[2]  We use initials to protect the crime victim's privacy.

A-2831-21

Brian Lewis, a bouncer from the club, witnessed the incident. He approached L.V. as the robber fled and called 9-1-1. Elizabeth Police Department (EPD) officers arrived shortly after and used the "find my iPhone" feature to trace the location of L.V.'s phone. Her phone was at an address on Front Street, a short distance from the crime scene. Police arrived at the Front Street address and found it to be "a relatively deserted commercial area with a dead end." EPD Officer Herbert Gonzalez observed two black men walking on the dead-end street. The two men were later identified as Steven Chambers and defendant. Gonzalez also saw a red Buick parked in the area. He looked into the car and saw a metal style case, a purse, and a bag—the same items L.V. reported stolen.

Police transported L.V. to the Front Street address to conduct a showup identification.[3] When she arrived at Front Street, L.V. was taken to the red vehicle and asked to look inside. She identified the items as the property that was taken from her.

---

[3] In State v. Henderson, 208 N.J. 208 (2011), our Supreme Court explained the difference between showup identifications and other out-of-court identification procedures, such as a photo array or lineup. The Court noted, "[s]howups are essentially single-person lineups: a single suspect is presented to a witness to make an identification. Showups often occur at the scene of a crime soon after its commission." Id. at 259.

L.V. testified the police told her "they had found two, I guess, suspects or whatever and I was going to be shown the suspects and—you know, I would be asked to [identify] who robbed me." EPD Officer Joesph Wassel told L.V. the individuals she would be seeing "may or may not be involved in the crime she reported." He also told L.V. that "if she did not recognize anybody, for her to tell [them] as much. And that she did not have to identify anybody if she didn't feel that she saw anybody involved in the incident."

L.V. viewed Chambers and defendant one at a time while she was seated in the police car. The suspects had their hands behind their backs. Both suspects had dreadlocks and were wearing black hoodies. First, police put Chambers in front of the police car. L.V. did not identify him as her assailant. Next, defendant was placed in front of the police car. L.V. immediately identified defendant, telling police she was "100 percent sure" defendant was the person who robbed her.

L.V. was transported to EPD Headquarters where she gave a formal statement. In her statement, L.V. described the robber as "a black male, maybe 5'8" to 5'10" . . . [h]e had a medium build. He possibly had braids but he had a black knit hat on. He was wearing a black hoodie with the hood down."

That night, police searched the red vehicle and the surrounding area but did not find the handgun used in the robbery. The next day, a security guard found the handgun in a pile of snow at the Front Street address.

On May 6, 2014, defendant was charged by indictment with: first-degree robbery, N.J.S.A. 2C:15-1 (count one); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count two); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count three); third-degree theft, N.J.S.A. 2C:20-3 (count four); and fourth-degree illegal possession of a large capacity magazine, N.J.S.A. 2C:39-3(j) (count five). That same day, defendant was also charged under a separate indictment with second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b).

Defendant moved to suppress L.V.'s showup identification. On July 23, 2015, after hearing oral argument, the trial judge denied defendant's suppression.

A jury trial was convened in September 2015. Lewis, the bouncer who called 9-1-1, testified that he was walking through the parking lot outside the club when he saw an unknown man exit his car and walk towards L.V. He described the car as a four door "red Oldsmobile." Lewis was standing about twenty feet away from L.V. during the robbery and testified the parking lot was

well lit. He could not describe the robber other than that he was a black male, which he "discerned based upon his observation of the robber's hands holding the gun." On cross-examination, he testified he saw the gun pointed at L.V.'s head.

During her testimony, L.V. pointed at defendant in the courtroom and identified him as her attacker. She testified she was able to see the man clearly because there was a streetlight overhead.

She also testified regarding the showup identification procedure. L.V. stated that two officers drove her to a separate location after police arrived at the club. She sat in the backseat of an unmarked police car while the officers sat in the front seats. When they arrived at the new location, she recognized the car the robber drove and identified her stolen belongings inside.

Officers Gonzalez and Wassel also testified regarding the showup procedure. Gonzalez confirmed L.V. sat in the back seat while each individual was brought before the car in bright light. Wassel testified he was the driver, his partner was in the front passenger seat, and L.V. was in the back seat. He testified that "he did not speak to L.V. beyond explaining that she was going to view two individuals separately; specifically, individuals who may or may not have been involved in the crime." He also testified about the lighting at the

7

scene, the fact that the individuals were shown separately, and that both suspects were handcuffed behind the back.

During closing arguments, defense counsel highlighted the discrepancies between Lewis's and L.V.'s testimony, including where the robber pointed the gun. He also focused on inconsistencies in L.V.'s version of events, arguing "she can't keep her story straight." Counsel suggested it made no sense that rather than fleeing from the area on one of the nearby major highways, a robber would flee a short distance to a dead-end area where he could be easily discovered. Counsel also argued it was incredulous that a robber would dispose of the crime gun in a pile of snow.

Based on the foregoing evidence, the jury returned guilty verdicts on all counts of both indictments. Defendant was sentenced on January 8, 2016. After granting the State's motion for an extended term, the trial judge imposed a twenty-five-year state prison sentence on the first-degree robbery conviction, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The judge merged the convictions on counts three and four into count one. The judge sentenced defendant to a concurrent ten-year prison term on count two, and a concurrent eighteen-month prison term on count five. The judge sentenced

defendant to a consecutive eight-year prison term with a five-year period of parole ineligibility on the certain persons conviction.

Defendant filed a direct appeal, arguing: (1) the trial court erred by denying his Wade[4] motion; (2) the trial court made erroneous evidentiary rulings; (3) defendant was deprived of a fair trial; and (4) the trial judge imposed an excessive sentence. On February 26, 2019, we affirmed the convictions and sentence. State v. Diken, No. A-2345-15 (App. Div. Feb. 26, 2019). On September 23, 2019, the New Jersey Supreme Court denied defendant's petition for certification. State v. Diken, 239 N.J. 404 (2019).

In October 2019, defendant filed a pro se PCR petition. He subsequently submitted a certification, amended verified petition, appointed PCR counsel's brief and appendix, and police reports.

On February 10, 2021, Judge Walsh held a non-evidentiary PCR hearing. On March 11, 2021, she issued an order and thirty-nine-page written opinion denying defendant's petition in part and granting an evidentiary hearing as to specific issues. In the March 11th opinion, Judge Walsh addressed defendant's arguments that his trial counsel rendered constitutionally deficient assistance by failing: (1) to use height as a factor during the Wade hearing; (2) to request a

---

[4] United States v. Wade, 338 U.S. 218 (1967).

third-party guilt jury charge; (3) to request a <u>Delgado</u>[5] jury instruction regarding the officers' failure to record the showup identification; and (4) to object when defendant was brought before the jury surrounded by sheriff's officers.

Judge Walsh denied defendant's PCR petition in part but granted an evidentiary hearing "concerning whether or not he was brought into the courtroom, in front of the jury, while surrounded by sheriff's officers." The judge noted the "[r]elevant facts lie outside the trial record, necessitating the testimony of trial counsel on this discrete issue."

Judge Walsh conducted testimonial evidentiary hearings on April 16, 2021 and December 16, 2021. On January 14, 2022, she issued an order and thirty-page written opinion denying defendant's petition.

This appeal follows. Defendant raises the following contentions for our consideration:

> POINT I
>
> [DEFENDANT] IS ENTITLED TO RELIEF ON HIS CLAIMS THAT HIS ATTORNEYS RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO CURE THE ERROR ADEQUATELY WHEN HE WAS BROUGHT BEFORE THE JURY BY SHERIFF['S] OFFICERS IN A PREJUDICIAL MANNER AND BY FAILING TO ADEQUATELY CHALLENGE A JUROR AS TO HER BIAS.

---

[5] <u>State v. Delgado</u>, 188 N.J. 48 (2006).

POINT II

[DEFENDANT] IS ENTITLED TO AN EVIDENTIARY HEARING ON HIS CLAIMS THAT COUNSEL WAS INEFFECTIVE AS TO HIS MOTION TO SUPPRESS IDENTIFICATION AND IN FAILING TO ASK FOR A DELGADO INSTRUCTION AND A THIRD-PARTY GUILT INSTRUCTION.

POINT III

THESE ERRORS CUMULATIVELY DEPRIVED [DEFENDANT] OF HIS RIGHT TO A FAIR TRIAL AND RENDERED HIS CONVICTIONS UNJUST.

II.

We begin our analysis by acknowledging the foundational legal principles governing this appeal. PCR serves the same function as a federal writ of habeas corpus. State v. Preciose, 129 N.J. 451, 459 (1992). When petitioning for PCR, a defendant must establish, by a preponderance of the credible evidence, that he or she is entitled to the requested relief. Ibid. To sustain this burden, the petitioner must allege and articulate specific facts, "which, if believed, would provide the court with an adequate basis on which to rest its decision." State v. Mitchell, 126 N.J. 565, 579 (1992).

In addressing an ineffective assistance of counsel claim, New Jersey courts follow the two-part test articulated by the United States Supreme Court

11

in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  <u>See</u> <u>State v. Fritz</u>, 105 N.J. 42, 58 (1987).  "First, the defendant must show that counsel's performance was deficient."  <u>State v. Gideon</u>, 244 N.J. 538, 550 (2021) (quoting <u>Strickland</u>, 466 U.S. at 687).  "Second, the defendant must have been prejudiced by counsel's deficient performance."  <u>Ibid.</u>  (quoting <u>Strickland</u>, 466 U.S. at 687).

To meet the first prong of the <u>Strickland</u>/<u>Fritz</u> test, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  <u>Strickland</u>, 466 U.S. at 687.  Reviewing courts indulge in "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . ."  <u>Id.</u> at 689.  "A court evaluating a claim of ineffective assistance of counsel must avoid second-guessing defense counsel's tactical decisions and viewing those decisions under the 'distorting effects of hindsight.'"  <u>State v. Marshall</u>, 148 N.J. 89, 157 (1997) (quoting <u>Strickland</u>, 466 U.S. at 689).

The second <u>Strickland</u> prong is especially demanding.  It requires the defendant show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  <u>Strickland</u>, 466 U.S. at 687.  Put differently, counsel's errors must create a "reasonable probability" that the outcome of the proceedings would have been different if counsel had not made

the errors.  Id. at 694.  This "is an exacting standard."  Gideon, 244 N.J. at 551 (quoting State v. Allegro, 193 N.J. 352, 367 (2008)).  "Prejudice is not to be presumed," but must be affirmatively proven by the defendant.  Ibid. (citing Fritz, 105 N.J. at 52, and Strickland, 466 U.S. at 693).

A defendant may show that an evidentiary hearing is warranted to develop the factual record in connection with an ineffective assistance claim.  Preciose, 129 N.J. at 462-63.  However, "[i]f the court perceives that holding an evidentiary hearing will not aid the court's analysis of whether the defendant is entitled to [PCR], . . . then an evidentiary hearing need not be granted." Marshall, 148 N.J. at 158 (citations omitted).  A PCR court's decision to proceed without an evidentiary hearing is reviewed for an abuse of discretion.  State v. Vanness, 474 N.J. Super. 609, 623 (App. Div. 2023) (citing State v. Brewster, 429 N.J. Super. 387, 401 (App. Div. 2013)).

Furthermore, the mere raising of a claim for PCR does not entitle the defendant to an evidentiary hearing.  State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999).  The PCR court should grant an evidentiary hearing only when "(1) the defendant establishes a prima facie case in support of PCR; (2) the court determines that there are disputed issues of material fact that cannot be resolved by review of the existing record; and (3) the court determines that

13

an evidentiary hearing is required to resolve the claims asserted." Vanness, 474 N.J. Super. at 623 (citing State v. Porter, 216 N.J. 343, 354 (2013)).

With respect to the first of these three requirements, "[a] prima facie case is established when a defendant demonstrates 'a reasonable likelihood that his or her claim, viewing the facts alleged in the light most favorable to the defendant, will ultimately succeed on the merits.'" Porter, 216 N.J. at 355 (quoting R. 3:22-10(b)). "[V]ague, conclusory, or speculative" allegations are insufficient to warrant an evidentiary hearing. Ibid. (quoting Marshall, 148 N.J. at 158).

### III.

Turning to substantive matters, we first address defendant's contention his trial counsel was ineffective "for facilitating and failing to remedy adequately the prejudicial error which occurred when prospective jurors saw sheriff['s] officers escort [defendant] into the courtroom." In his initial PCR petition, defendant claimed he was forced to walk into the courtroom with sheriff's officers after the jury was seated. He argued "[c]ompetent counsel would have objected to such an entrance and, if unavoidable, would have requested a jury instruction to safeguard against any misunderstanding."

In his supplemental certification, defendant asserts:

During the trial, there was a day when the jury was brought into the courtroom before I was present at the lawyer[']s table. I was told that I needed to not worry about it and just follow the officers into the courtroom and sit down.

I told my attorney that I did not want to enter the courtroom in this manner because the jury would see that I was locked up. However, he told me I had no choice and that I had to follow him inside. So, on this day, I was escorted to the table by officers. When I complained to my attorney about what had happened, he refused to do anything about it.

We note defendant also raised this issue during the sentencing hearing and in his direct appeal.[6]

During the PCR evidentiary hearing, former assistant prosecutor and lead trial counsel Armando Suarez testified for the State. On September 16, 2015, the parties were returning from a break during jury selection when Suarez was told the in-custody defendant was brought into the courtroom and sat down at counsel table while potential jurors were present during jury selection. He did not recall being present in the courtroom at the time. He recalled that defendant was in business attire during the trial, not prison garb.

---

[6] We determined that issue was "without sufficient merit to warrant discussion." Diken, slip. op. at 7.

Suarez, his co-counsel, defense counsel, and the trial judge held an off-the-record in-chambers conference. Suarez remembered that Mark Bailey, defendant's trial counsel, expressed his displeasure at the incident and objected. As summarized by Judge Walsh, counsel and the trial judge remedied the situation as follows:

> [A]ll potential jurors would be asked to leave the courtroom and, upon their return and their being seated, all counsel, the defendant and two sheriff's officers (one in the front of the group and one at the back) would enter the courtroom from the same rear entrance defendant had previously entered. This rear entrance was described as a wooden door with a square glass panel and was located to the left of the main exit doors. This door led to a secure corridor where prisoners entered as well as other court staff. The described plan was thereafter executed and defendant was not handcuffed or shackled. No mention of this incident or the remedy was placed on the record.

Suarez also provided his "9/16/15" trial notes, which read:

> 12:26 lunch break 1 hr. - return 1 :30 p.m.
>
> defense objects to jury seated before defendant in ct. (remedied this by defense counsel, defendant, and both AP's entering from back door)
>
> 1:45 back in.

During Bailey's PCR hearing testimony, he referred to the incident as the "handcuff" matter. He did not have a specific recollection of the incident. He

16

remembered the parties' meeting in the trial judge's chambers but was unsure as to what was discussed. He did not remember walking into the courtroom from the secured corridor with his client. Bailey testified that if defendant had told him jurors saw him in handcuffs, he would have asked for a mistrial.

Defendant testified at the PCR hearing and claimed he was escorted by the sheriff's officers into the courtroom and taken to counsel table when "people were in the jury box." He recalled that his attorney was already sitting at the table. Defendant testified he was handcuffed behind the back and the officers took his handcuffs off before he sat down. Defendant described the situation as "awkward," "traumatic," and "embarrass[ing]." He "remembered the situation clearly due to Juror 8, [a] black female that he wanted removed from the jury, [was] seated in the jury box at the time he was led out in handcuffs." Further, defendant testified he told his prior PCR counsel about the handcuffs despite the fact his supplemental PCR certification does not mention handcuffs.

We need only briefly summarize the governing legal principles. In State v. Artwell, our Supreme Court explained:

> A courtroom arrangement is "inherently prejudicial" when "'an unacceptable risk is presented of impermissible factors coming into play.'" [Holbrook v. Flynn, 475 U.S. 560, 570 (1986)] (quoting Estelle v. Williams, 425 U.S. 501, 505 (1976)).

Consistent with the right to a fair trial, a trial court may not require a defendant to appear before the jury in restraints absent compelling reasons. State v. Damon, 286 N.J. Super. 492, 498-99 (App. Div. 1996) (citing Illinois v. Allen, 397 U.S. 337, 344 (1970)); State v. Roberts, 86 N.J. Super. 159, 162-63 (App. Div. 1965). We disfavor placing physical restraints on a defendant at trial because the jury is likely to consider such a defendant "'as being in the opinion of the judge a dangerous man, and one not to be trusted, even under the surveillance of officers.'" Kennedy v. Cardwell, 487 F.2d 101, 106 (6th Cir. 1973) (quoting State v. Kring, 64 Mo. 591, 593 (1877)), cert. denied, 416 U.S. 959 (1974). Similarly, the fair trial right precludes the State from requiring that a defendant appear at trial in distinctive prison garb. State v. Carrion-Collazo, 221 N.J. Super. 103, 112 (App. Div. 1987) (citing Estelle, 425 U.S. at 504-05). Allowing defendants to appear in prison garb is improper because it "'may affect a juror's judgment,' 'furthers no essential state policy' and 'operates usually against only those who cannot post bail prior to trial.'" Carrion-Collazo, 221 N.J. Super. at 109 (quoting Estelle, 425 U.S. at 505).

[177 N.J. 526, 534-35 (2003).]

Defendant now argues "the only issue is whether the remedy was inadequate to cure the prejudice such that defense counsel's acquiescence to the remedy was ineffective." He maintains "the remedy did not cure the inherent prejudice." Defendant argues it "enhanced" the impression that he was incarcerated and "only served to show the jurors that all parties had access to

the holding cell area." Because this incident occurred during voir dire, defendant argues his counsel should have moved to dismiss the panel.

Defendant further argues the present facts are distinguishable from those in State v. Zhu, 165 N.J. 544 (2000), where our Supreme Court noted that "[c]ourts in other jurisdictions have found similarly that the presence of additional security personnel in a courtroom, alone or in combination with other security measures, is not prejudicial." Id. at 554-55. In Zhu, the Court found that the deployment of increased security personnel in the courtroom was not "so overbearing that it infringed on [the defendants'] presumed innocence, thereby denying them a fair trial." Id. 552. Unlike the defendant in Zhu, defendant notes he did not pose a security threat.

Based on the evidence presented by both parties at the PCR evidentiary hearing, Judge Walsh found "defendant presents no credible evidence to suggest that he was escorted into the courtroom by sheriff's officers in handcuffs." See Preciose, 129 N.J. at 459. Importantly, Judge Walsh found Suarez's testimony credible and defendant's testimony not credible. Judge Walsh also credited Bailey's testimony, noting Bailey "forthrightly stated that he did not recall the event." The judge explained, "[i]t appears that parts of what defendant recalled were accurate, but that the recent addition of handcuffs was an embellishment."

Further, Judge Walsh reasoned, it "defies logic that [the trial judge], an experienced criminal jurist, would be made aware of a defendant being observed in handcuffs before a potential jury and . . . fashion either the remedy described by Mr. Suarez or, no remedy at all, as suggested by defendant." (emphasis in original).

We are satisfied credible evidence in the record supports the PCR court's finding that potential jurors did not observe defendant in handcuffs. Thus, we have no basis upon which to disturb that critical factual finding.

We also accept Judge Walsh's conclusion that defendant was not prejudiced by sheriff's officers escorting him into the courtroom. Judge Walsh found that the "credible evidence here supports that the sheriff's officers escorted [defendant] into the courtroom in a manner that would not strike the prospective jurors as anything other than the 'similar security measures' that they witness when entering the courthouse setting." See Zhu, 165 N.J. at 544-45 ("Common experience informs us that citizens have become accustomed to the presence of security personnel in most public places."). Judge Walsh concluded, "[t]he presence of sheriff's officers in a courtroom near defendant, with defendant free from restraints and prison garb, would not have raised any suspicions in the minds of prospective jurors that defendant was a 'dangerous

20                                                                          A-2831-21

man.'"  We agree.  We also agree with Judge Walsh that "in an abundance of caution, the [trial] court and counsel crafted a remedy in an attempt to alleviate defendant's concerns."  In these circumstances, the PCR correctly held that defendant has not establish a prima facie case with respect to the courtroom entrance incident under either prong of the Strickland/Fritz test.  See Preciose, 129 N.J. at 463-64.

## IV.

We turn next to defendant's contention that counsel rendered ineffective assistance by failing to use a peremptory challenge or move to excuse a juror for cause.  During voir dire, the following colloquy occurred between a potential juror and the trial judge:[7]

> THE COURT:  Okay. And who do you know with regard to [the question on the juror questionnaire regarding possible conflicts]?
>
> JUROR 8:  Well, I work for [EPD].
>
> THE COURT:  I'm sorry, ma'am?
>
> JUROR 8:  I work for [EPD].
>
> THE COURT:  Oh. What do you do for them?
>
> JUROR 8:  Data entry.

---

[7] That potential juror was eventually seated as Juror 8.  We refer to her as Juror 8 even though that was not her designation at the time of the voir dire colloquy.

21

THE COURT: How long have you been at EPD?

JUROR 8: Just about [fourteen] years now.

THE COURT: Do you know any of the [o]fficers listed on the [witness list] sheet?

JUROR 8: (Indiscernible) I know their names. I can't put a face with the name.

THE COURT: Okay. You . . . know their names because of the data entry. I understand. Would the fact that. . . you work for them have any impact on your ability to judge this case fairly?

JUROR 8: No.

THE COURT: Okay. And . . . have you ever applied for a job in law enforcement—

JUROR 8: (Indiscernible).

THE COURT: —just Elizabeth [Police Department]? Any others?

JUROR 8: No.

THE COURT: Is that the only job you held down there is data entry? Did you hold any other position?

JUROR 8: In the [p]olice [d]epartment?

THE COURT: Yes, ma'am.

JUROR 8: I did dispatch for maybe three or four months.

22

THE COURT:  And that was about [fourteen] years ago?  Okay.  And you've been in data entry ever since?

JUROR 8:  Yes.

THE COURT:  Okay. And what's that involve, data entry, down in EPD?

JUROR 8:  Well—

THE COURT:  Are you . . . located in the [p]olice [b]uilding on West Grand?

JUROR 8:  Yes.

THE COURT:  Okay.

JUROR 8:  We collect the reports taken by the officers. We collect the—um—[d]omestic [v]iolence [r]estraining [o]rders.  We enter them names—well, we were entering the names in the computer.  But now we got a new computer system where we don't even see the reports (Indiscernible).  We do—the majority of our work consists of entering the [r]estraining [o]rders.

THE COURT:  Would your job down there, your application process in getting that job and . . . still holding that job have an impact on your ability to be fair and impartial?

JUROR 8:  No.

. . . .

THE COURT:  Okay. All right.  A [p]olice [o]fficer is more likely, less likely, or as likely to tell the truth than people who aren't [p]olice [o]fficers?

23

JUROR 8: I would say as likely.

THE COURT: And why do you say that, ma'am?

JUROR 8: Because they bound by the law. It doesn't—so they have to tell the truth because if there's a witness out there (indiscernible) contradiction, then—

THE COURT: I'm sorry. Because if there's a witness out there?

JUROR 8: (Indiscernible) contradict what they're saying, then they don't have—really have (indiscernible).

THE COURT: Would you give greater or lesser weight to their testimony because of their status as [p]olice [o]fficers?

JUROR 8: I'd give greater.

THE COURT: Why do you say that?

JUROR 8: Because their job is on the line if they found to be lying.

THE COURT: How do you feel about the principle in open-ended [q]uestion [n]umber [two] that the defendant on [t]rial is presumed innocent and has to be found not guilty unless the State proves the elements of the offense beyond a reasonable doubt?

JUROR 8: I agree with it.

THE COURT: Why do you say that?

JUROR 8: Because if someone is gonna accuse me of doing something and I know I didn't do it, then the

24

burden of proof has to be on them . . . to prove that I did.

THE COURT:  And how about [n]umber [three], that the burden is always on the State, never shifts over?

JUROR 8:  I agree.

THE COURT:  And why do you say that?

JUROR 3:  Again, if you're gonna accuse somebody of doing something, then you have to prove that they did it.

After this colloquy, Bailey, Suarez, and the trial judge had a sidebar discussion.  Bailey explained his concerns about the potential bias of Juror 3, who was voir dired before Juror 8.  Juror 3 indicated police officers are more likely to tell the truth and expressed uncertainty about the presumption of a defendant's innocence.  Juror 3 was subsequently excused.  Bailey did not challenge Juror 8 at the sidebar conference.

On September 29, 2015—several days into trial—defendant sent a letter to the trial judge concerning Juror 8, which read:

Your Honor, I have just recently discovered one of the jur[ors] works for the [EPD] as a data entry, which is an extremely huge problem for me because we've got a conflict of interest, that's a conflict of interest. I addressed that to my attorney, also.  Can you please look into that as the trial judge.  All I'm asking for is a fair trial.  Thank you. Sincerely, [defendant].

A-2831-21

In response to defendant's letter, the trial judge noted Juror 8's employment with the EPD was limited to data entry. The judge also noted her employment was discussed during voir dire, during which Bailey and defendant were in constant communication. Furthermore, Bailey explained to the trial judge that "the 'totality' of Juror 8's answers made her an 'attractive juror.'"[8] Bailey nonetheless related that his customary practice is to ensure his client is satisfied with the jury composition. Bailey informed the judge he only just learned defendant wanted to remove Juror 8, and "[i]n light of the change of heart from his client, trial counsel moved to have Juror 8 removed."

The trial judge rejected that request, ruling:

> For the record we're in day five of our trial. Jury selection occurred on September 16th and 17th. The trial continued on 9/22. Actually, we did not sit on the 24th because Juror No. 10 called in sick, so this is actually the fourth day of trial. During the first day of trial there was no indication that Juror No. 8 was unacceptable.
>
> This is not a case where a juror failed to disclose anything during voir dire. Juror No. 8 was up front and

---

[8] We note that during his testimony at the PCR evidentiary hearing, Bailey explained his trial strategy "was to ensure that the jury believed the police testimony; specifically, that he wanted jurors to believe the police diligently recorded the information provided to them by witnesses and the victim in their reports." His goal "was to highlight inconsistencies in the accounts of the robbery through meticulous police reporting."

A-2831-21

fully disclosed that she worked for [EPD]. She outlined exactly what she did and what she did in prior jobs with them. She did not indicate at all, as Mr. Suarez indicated, that she knew any of the police officers on the witness list.

So this is not a case where the defense or anyone, for that matter, was misinformed or inadequately informed so that they were unable to exercise a [peremptory] challenge thereby depriving the parties of a fundamental right to a fair trial.

If we excuse Juror No. 8 now, first of all, we would be down to only [twelve] jurors, with at least besides today, at [least] one, if not two or more days left in the trial, and we've had problems with losing jurors, specifically Juror No. 10 with the illness of her daughter.

But more importantly, the composition of the jury would be changed. For the record, Juror No. 8 is a female African-American, is past the summer of her life I would say, perhaps not as past as I am but nonetheless is past.

She did indicate all of her connections and what this amounts to really is manipulation of the jury or an attempt to manipulate the jury by the defense at this time.

So I'm not going to excuse Juror No. 8. There's no indication that she could not be fair and impartial. And it would be folly to allow the defense to in the middle of trial exercise [peremptory] challenges so your application is denied.

A-2831-21

An appellate court reviews a trial court's handling of voir dire in accordance with a deferential standard. State v. Little, 246 N.J. 402, 413 (2021). "Voir dire procedures and standards are traditionally within the broad discretionary powers vested in the trial court. . . ." State v. Papasavvas, 163 N.J. 565, 595 (2000); see Little, 246 N.J. at 413-14. Accordingly, "'a trial court's decisions regarding voir dire are not to be disturbed on appeal, except to correct an error that undermines the selection of an impartial jury.'" Little, 246 N.J. at 413 (quoting State v. Winder, 200 N.J. 231, 252 (2009)).

Relatedly, a juror's statement that they are capable of being fair and impartial is afforded great weight and a reviewing court should defer to the trial court's determination of the prospective juror's sincerity and credibility regarding fairness and impartiality. State v. Singletary, 80 N.J. 55, 64 (1979); see State v. Carroll, 256 N.J. Super. 575, 599 (App. Div. 1992) ("Ordinarily, a juror's declaration of impartiality will be accorded great weight and a judge's assessment of a juror's credibility in responding to questions will be respected.").

Applying these legal principles to the present facts, we agree with Judge Walsh that defendant has not established a prima facie case of ineffective assistance of trial counsel with respect to the seating of Juror 8. See Preciose,

28

129 N.J. at 463-64. Based on Bailey's credible testimony and the trial judge's observation that Bailey and defendant were in constant communication during voir dire, the PCR court found "trial [counsel] consulted with defendant and sought defendant's approval regarding prospective jurors." Juror 8's employment with the EPD, moreover, was thoroughly explored in voir dire. The trial found Juror 8 sincere regarding her ability to be fair and impartial. See Singletary, 80 N.J. at 64. Additionally, the trial judge found "this late request was an effort to manipulate the jury, would change the racial composition of the jury and might cause an issue with availability of enough jurors to deliberate." See Little, 246 N.J. at 413.

We emphasize that defendant's current argument ignores that his trial counsel's voir dire strategy whereby he wanted jurors who believed police officers because the planned defense trial strategy was to use police reports to undermine the testimony of the State's civilian witnesses. See supra note 8. Given the strong presumption a trial counsel's performance "might be considered sound strategy," Judge Walsh correctly concluded Bailey did not provide deficient representation. See Strickland, 466 U.S. at 689. As Judge Walsh thoroughly and cogently explained:

> During the testimonial hearing, trial counsel believably
> stated that the decision to include a prospective juror

that affords greater weight to police testimony, such as Juror 8, was a strategic decision. According to trial counsel, the strategy for this particular case was to utilize the police reporting and testimony to highlight the inconsistencies of the witnesses and facts recorded by police concerning the crime. Trial counsel aimed to highlight inconsistencies, within meticulous reporting by police, to show that defendant was not the robber. In sum, Juror 8's statements, including the ability to be fair and impartial, as well as the statement affording greater weight to police testimony, were the support for why he described Juror 8 as an "attractive juror." As such, even when examining the facts in the light most favorable to the defendant, this [c]ourt finds that trial counsel was not deficient under the first prong of the Strickland/Fritz test. Mr. Bailey was acting in a manner consistent with his trial strategy. Thereafter, once his client voiced objection through the letter, he put his strategy aside and asked the court to remove Juror 8. This bolsters Mr. Bailey's position that if his client objected to Juror 8 during voir dire that he would have honored that request and made the application.

V.

Relatedly, defendant also argues his appellate counsel was ineffective for failing to argue that Juror 8's answers showed that she was biased in favor of police witnesses. That argument fails for the same reasons that lead us to conclude that defendant's trial counsel was not ineffective in protecting defendant's interests during the jury selection process.

The right to effective assistance of counsel extends to appellate counsel on direct appeal. State v. O'Neil, 219 N.J. 598, 610-11 (2014). "A first appeal

30

as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney." Evitts v. Lucey, 469 U.S. 387, 396 (1985). As such, claims of ineffective assistance of counsel on appeal are examined under the Strickland/Fritz standard. State v. Guzman, 313 N.J. Super. 363, 374 (App. Div. 1998).

Applying that test, the PCR court did not err in finding defendant's appellate counsel provided adequate representation. Nor was defendant prejudiced by appellate counsel's failure to raise the voir dire issue. For the reasons we explained in the preceding section, trial counsel's decision not to excuse Juror 8 peremptorily was a strategic decision that ought not be second-guessed by reviewing courts, whether on direct appeal or PCR. Appellate counsel was under no obligation to raise an issue that lacks merit. See generally State v. O'Neal, 190 N.J. 601, 619 (2007) (holding "[i]t is not ineffective assistance of counsel for defense counsel not to file a meritless motion. . . ."); State v. Worlock, 117 N.J. 596, 625 (1990) ("The failure to raise unsuccessful legal arguments does not constitute ineffective assistance of counsel."); State v. Morrison, 215 N.J. Super. 540, 549 (App. Div. 1987) (citing Jones v. Barnes, 463 U.S. 745 (1983)) (explaining "appellate counsel does not have a

constitutional duty to raise every nonfrivolous issue requested by the defendant").

VI.

We next address defendant's contentions regarding the victim's out-of-court identification. Defendant argues the record supports his claim that Bailey was constitutionally deficient in arguing the motion to suppress L.V.'s out-of-court identification. Specifically, defendant contends the out-of-court identification was unreliable given the physical similarities between defendant and Chambers. Defendant argues, for example, "trial counsel failed to elicit the most glaring variable in support of a finding that there was a very substantial likelihood or irreparable misidentification—that [defendant] was 6'2" tall but the perpetrator was between 5'6" and 5'10" tall, a similar height to Chambers, who was 5'9" tall."

Relatedly, defendant contends that once the suppression motion was denied, "counsel was prima facie ineffective for failing to request a remedial jury charge pursuant to Delgado and Rule 3:11, telling the jury that the rules were not followed in this case, undermining the reliability of the identification."

We are unpersuaded by both of defendant's current contentions. As our Supreme Court explained in Henderson, showup identifications are "inherently

suggestive" because often, it will be readily apparent that the person is in police custody so that the witness will know that the person on display is a suspect and has been arrested by police. 208 N.J. at 259. The Court nonetheless accepted the finding of its Special Master that "'the risk of misidentification is not heightened if a showup is conducted immediately after the witnessed event, ideally within two hours' because the 'benefits of a fresh memory seem to balance the risks of undue suggestion.'" Ibid. Here, the showup procedure was conducted shortly after the robbery.

At the July 16, 2015 Wade hearing, the trial judge acknowledged some concerns with the identification procedures and recording, but concluded that "[c]onsidering all of the[] factors, the evidence presented shows the identification to be reliable." The trial judge explained that any suggestiveness, like defendant being in police custody and handcuffed, was ameliorated by L.V.'s immediate identification of defendant as the robber. He also found the initial interaction between L.V. and the robber, due to her believing the individual was a bouncer, resulted in a "stress free" environment giving L.V. a "unique opportunity to view the robber before she felt any stress."

In these circumstances, trial counsel's performance with respect to the Wade hearing resulted in no prejudice, since the circumstances of the showup

did not render the out-of-court identification inadmissible.  See Strickland, 466 U.S. at 687.

We thus focus on defendant's PCR argument with respect to the Delgado jury instruction.   In Delgado, the New Jersey Supreme Court required that, "as a condition to the admissibility of an out-of-court identification, law enforcement officers make a written record detailing the out-of-court identification procedure, including the place where the procedure was conducted, the dialogue between the witness and the interlocutor, and the results."  188 N.J. at 63.  The Court encouraged, but did not require, videotaping all statements to preserve the identification procedures. Ibid.

In 2012, the Supreme Court promulgated Rule 3:11(b), which provided:

> A law enforcement officer shall contemporaneously record the identification procedure in writing, or, if feasible, electronically. If a contemporaneous record cannot be made, the officer shall prepare a record of the identification procedure as soon as practicable and without undue delay. Whenever a written record is prepared, it shall include, if feasible, a verbatim account of any exchange between the law enforcement officer involved in the identification procedure and the witness. When a written verbatim account cannot be made, a detailed summary of the identification should be prepared.

In 2020, Part (b) of the Rule was amended to read:

A law enforcement officer shall electronically record the out-of-court identification procedure in video or audio format, preferably in an audio-visual format. If it is not feasible to make an electronic recording, a law enforcement officer shall contemporaneously record the identification procedure in writing and include a verbatim account of all relevant verbal and non-verbal exchanges between the officer and the witness; in such instances, the officer shall explain in writing why an electronic recording was not feasible. If it is not feasible to prepare a contemporaneous, verbatim written record, the officer shall prepare a detailed written summary of the identification procedure as soon as practicable and without undue delay, and explain in writing why an electronic recording and a contemporaneous, verbatim written account were not feasible.

Defendant now contends "the 2012 version of Rule 3:11, which was in effect at the time of [defendant's] trial, states that a remedy for the violation of Rule 3:11 is for the trial court to 'fashion an appropriate jury charge to be used in evaluating the reliability of the identification.'" But here, the Rule was not violated. Importantly, on direct appeal, we held:

The on-scene identification report and statement prepared for [the victim's] identification of defendant contained the date, time of incident, time and location of on-scene identification, the result of the identification, the statement made when she identified defendant, her confidence in her identification and that she only spoke to officers prior to and during the identification.

We noted:

> The investigation report recounted the actions of the officers who responded and what they did in the investigation. Each of these documents, although not prepared on the scene, were prepared contemporaneously, and together, contain all of the information required by Rule 3:ll(b). The identification was procedurally sound.
>
> [Diken, slip op. at 5.]

Judge Walsh thus correctly held that "[b]ased on the then-active law, the officers did not violate existing law, and thus no such jury charge would have been required." Accordingly, trial counsel "did not render deficient performance for failing to ask the court to apply [a] non-existent rule and jury instruction."

VII.

Defendant next argues his trial counsel rendered ineffective assistance by failing to argue third-party guilt in summation and by failing to request a jury instruction regarding third-party guilt. Specifically, defendant contends the evidence supported a viable defense that Chambers was the robber. Defendant supports that claim by noting the victim described the robber's height as between 5'6" and 5'10" tall while defendant is over 6' tall. Defendant also notes that at the time of his arrest, he was in possession of $164, while Chambers had $442 cash.

In rejecting defendant's argument, Judge Walsh explained:

> The evidence provided on the record, as well as defendant's certification regarding off-the-record conversations, lead this [c]ourt to reaffirm the conclusion that trial counsel was not deficient. Although ultimately unsuccessful, trial counsel exercised sound trial strategy in arguing the "hookup gone wrong" theory of the case, rather than argue a theory he did not believe had evidentiary support. Each piece of evidence that defendant now points to regarding . . . possible third-party guilt did not rise to a sufficient evidentiary basis necessary for the charge. As this [c]ourt has previously stated, any inclusion or request of a third-party guilt jury charge would have been unnecessary, and possibly confusing to the jury. Defendant even acknowledges that trial counsel did not request a third-party guilt jury charge due to a lack of evidence to support it. As such, [t]his [c]ourt remains of the opinion that trial counsel was not deficient in not requesting a third-party guilt jury charge. Trial counsel exercised sound legal judgment and proper representation when he decided to argue on the "hookup gone wrong" theory rather than seeking a baseless third-party guilt jury instruction.

We concur with Judge Walsh's analysis and conclusion.

## VIII.

Finally, we address defendant's contention his trial counsel's errors "cumulatively deprived [defendant] of his right to a fair trial and rendered his convictions unjust." The cumulative effect of trial errors may warrant reversal when it "casts doubt on the propriety of the jury verdict that was the product of

37

that trial." State v. Jenewicz, 193 N.J. 440, 474 (2008). Reversal may be justified when the cumulative effect of a series of errors is harmful, even if each error itself is harmless. Id. at 473. "[T]he predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair." State v. Wakefield, 190 N.J. 397, 538 (2007).

In a PCR appeal, the cumulative error doctrine must be viewed through the prism of the Strickland/Fritz test. We conclude that none of defendant's PCR arguments, viewed individually or collectively, satisfy either prong of the two-part test. Defendant was neither deprived of effective assistance of counsel or prejudiced by any of trial counsel's tactical and strategic decisions. He has therefore failed to establish a basis for any additional evidentiary hearing, much less to overturn his trial convictions.

To the extent we have not specifically addressed them, any remaining issues raised by defendant in his PCR petition lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2831-21